Patrick C. GRANEY and Thelma Graney, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 2476.

United States District Court
S. D. West Virginia,
Charleston Division.

Sept. 13, 1966.

William H. Deck, Washington, D. C., for plaintiffs.

John B. Jones, Jr., Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C. and Milton J. Ferguson, U. S. Atty., Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

FIELD, Chief Judge.

In this action the plaintiffs seek to recover the sums of $10,770.04 and $10,-368.98 representing the amount of the income taxes allegedly overpaid by them for the years 1955 and 1956, respectively. Thelma Graney is involved as a plaintiff only because a joint return was filed by her and her husband and for the purposes of this opinion the plaintiff, Patrick Graney, will be referred to as taxpayer. The principal question presented is whether a certain transaction entered into between the taxpayer and his corporate employer in the year 1953 constituted a contract of sale which should have been taxable in full in that year, or whether the transaction was merely an option which required the taxpayer to recognize the taxable incidence in the year or years in which the option was exercised.

The taxpayer was president and a member of the board of directors of Gulf Mining Company as well as a member of the board of directors of West Gulf Coal Company prior to the merger of West into Gulf on June 30, 1953. The

directors of the two companies felt that a merger was desirable, and prevailed upon the taxpayer to accept the presidency of Gulf, the surviving corporation in the merger. Incident to their efforts to persuade the taxpayer to continue his participation in the management of the merged corporations, the two corporations Gulf and West, entered into an agreement with the taxpayer dated May 1, 1953, effective on June 1, 1953, permitting the taxpayer to purchase 500 shares of post-merger Gulf Mining stock at the price of $25 per share. The board of directors of Gulf ratified this agreement by resolution in which they set forth the details of the form of the agreement, the resolution providing among other things: " * * * that there be given to P. C. Graney the exclusive right and option to purchase 500 shares of the stock of the merged corporation, at the price of $25 cash, per share, during the period of five years commencing June 1, 1953, in whole or in part, * * *." The resolution further ratified, approved and confirmed the stock option agreement which had been entered into between Gulf and West Gulf and the taxpayer under date of May 1, 1953.

The agreement had been prepared by Charles Mahan, the taxpayer's personal attorney, after thorough consultation with the taxpayer. Mr. Mahan had also been present at the meetings of the boards of directors at which the proposed agreement was discussed.

The agreement, itself, was termed "THIS STOCK OPTION AGREEMENT." By its terms it granted unto the taxpayer "the exclusive right and option to purchase, during the period and upon the terms and provisions * * * FIVE HUNDRED (500) shares of the capital stock of Gulf Mining Company, the surviving corporation, * * *." It provided that the option should be effective for a period of five years commencing June 1, 1953, and that the taxpayer should have the right to exercise the option at the rate of 100 shares per year in each option year, or at his election should have the right to exercise it, in whole or in part, at any time during the five-year option term. It further provided that Gulf, immediately after the merger, was to issue 500 shares of stock in the taxpayer's name and that such shares were to be delivered to the Bank of Mount Hope to be held in escrow subject to the terms of the option agreement.

The agreement further provided that the taxpayer, his successors and assigns, should thereafter have the right to vote the stock, and to exercise all stockholder's rights with respect thereto and to receive all benefits therefrom during the life of the option. Paragraph SIXTH of the agreement reads as follows:

"Upon the exercise of this option in whole or in part by the payment of the purchase price to the Bank of Mount Hope for the account of the parties of the first part * * * the said Bank of Mount Hope shall release and deliver unto the party of the second part [taxpayer] * * * the number of shares so paid for."

Paragraph SEVENTH of the agreement provided in part as follows:

"Any stock which shall not have been purchased and paid for pursuant to this option on or before the 31st day of May, 1958, shall be by the Bank of Mount Hope returned to the parties of the first part, their successors or assigns, for cancellation or other disposition, as it or they shall direct."

On July 1, 1953, following the consummation of the merger between Gulf and West, five certificates for 100 shares each were issued by Gulf in the name of the taxpayer in accordance with the terms of the agreement. They were signed by the secretary of the corporation and by the taxpayer as president, and the taxpayer then took the certificates representing the aggregate of 500 shares and delivered them to the Bank of Mount Hope. Thereafter the taxpayer exercised his rights under the agreement for 100 shares each in the years 1953, 1954 and 1955. In 1956 he exercised his right under the agreement to acquire the last 200 shares. The shares of stock were held by the Bank until the taxpayer on

each occasion paid the purchase price for the stock, and after receiving payment, the Bank would release and deliver the certificate for the number of shares paid for to the taxpayer.

The taxpayer treated the agreement as an option in his Federal Income Tax Returns and in each year in which he exercised his rights under the agreement he included the excess of the fair market value of the stock he acquired over the stated purchase price in his income tax return as compensation income. Gulf also treated the agreement as an option on its financial statements which were prepared by the accounting firm of Ernst and Ernst, and in each year in which the taxpayer exercised his rights under the agreement, the corporation took as a deduction on its return the difference between what was considered the fair market value of the stock and the price paid for it by the taxpayer. During the years in question both the taxpayer and Gulf treated the stock as having a fair market value of $75 per share. In December of 1955 the taxpayer began to negotiate for the sale of his stock in Gulf and on January 4, 1956, he executed an option to sell his stock for $200 a share less a $10 brokerage commission. In February, 1956, the option was exercised and the taxpayer disposed of his stock for a net price of $190 a share.

In his 1956 return the taxpayer treated the difference between the sale price of his 500 shares in Gulf and his basis of $75 per share as a long-term capital gain. The Government took the position that in December, 1955, the fair market value of the stock in Gulf was $190 rather than $75 per share and that accordingly when the taxpayer exercised his rights to acquire 100 shares in December, 1955, as well as 200 shares in February of 1956, instead of realizing $50 per share as ordinary income, he, in fact, realized the difference between the option price of $25 per share and the market value of $190 per share. Accordingly the Government assessed deficiencies for each of the years 1955 and 1956. Additionally the Government imposed a 5% negligence penalty

in the assessment against the taxpayer. The taxpayer paid the deficiencies and filed timely claims for refunds for the years 1955 and 1956.

The argument on behalf of the taxpayer is to the effect that Graney became vested with ownership of the entire 500 shares of stock in the year 1953; that the full $25,000 value of the stock in excess of the purchase price became taxable to him in that year, and that upon the sale of the stock in 1956 the taxpayer was entitled to treat the entire sale as a long-term capital gain. The plaintiffs contend that the agreement executed in 1953 conferred "all significant incidents of ownership in the stock" in Graney, and that the escrow arrangement was merely a convenient mechanism for the orderly payment for the stock, and in no way militates against their contention that ownership was in fact vested in the taxpayer in 1953. Plaintiffs necessarily concede that the method used by them in reporting the income represented by the delivery of the stock from escrow in each of the years in question was erroneous and have indicated a willingness to admit a proper reassessment for the year 1953 in the event they should prevail in the present controversy.

It is true that the option agreement by its terms vested in the taxpayer a number of rights and privileges which ordinarily would be associated with ownership of stock. However, these rights were extended to the taxpayer by virtue of the specific language of the agreement rather than being merely incident to stock ownership as such. The law is well settled in West Virginia that an option is not a sale. It is a right of election in the party taking the same to exercise a privilege, and only when the privilege has been exercised in the manner specified in the option agreement does it become an absolute contract. It is simply a contract by which the owner of property agrees with another person that the latter shall have the right to purchase the property at a fixed price within a certain time. While the option extends the right to purchase, it imposes no binding obligation to

do so upon the person holding the option. See First Huntington National Bank v. Gideon-Broh Realty Co., 139 W.Va. 130, 79 S.E.2d 675. A study of the agreement here in question indicates quite clearly that there was no obligation upon the taxpayer to purchase any of the stock. The agreement spells out the right of the taxpayer to purchase and the manner in which the purchase could be exercised; but it also provides for disposition of the stock by the escrow agent in the event all or any part of the stock was not purchased pursuant to the option agreement. The fact that the taxpayer personally delivered the stock to the escrow agent is not significant in view of the fact that he was a shareholder in the corporation as well as its president, and in making this delivery was merely acting in his official capacity as an officer of the corporation. It is also significant that neither the taxpayer nor the corporation treated the taxpayer as owner of the stock on their books, records or federal tax returns until after the option was exercised. The evidence indicates quite clearly that the parties used the term option in its technical and legal sense and that it was the intention of the taxpayer as well as the other parties involved to handle the stock on an option basis.

The plaintiffs rely upon several cases to support their position. However, all of these cases can be distinguished from the case at hand by the fact that the person holding the "option" in the cases cited was under an obligation to purchase and the transaction in question was a matter of collateral security rather than an escrow arrangement such as we have here.

Upon the evidence before me it is my conclusion that the agreement between Gulf and the taxpayer in 1953 was, in fact, an option agreement rather than a sale and that accordingly the position of the Government in its treatment of the sale of the stock acquired in the years 1955 and 1956 was correct both as to the nature and value of the stock acquisition in those two years.

While I find that the deficiencies were properly assessed for the years in question, I do not believe that the Commissioner was justified in imposing the negligence penalty in this case. There was no attempt on the part of the taxpayer or any of those associated with him to disguise the transactions in question nor to withhold any of the facts bearing upon the tax ramifications thereof. While the Government takes the position that the penalty should stand in the absence of evidence to rebut the Commissioner's determination, it is my conclusion that the totality of circumstances as shown by the record in the present case would make it inappropriate for the Government to insist upon the 5% negligence penalty in this case. See Bennett v. Commissioner of Internal Revenue (8th Cir. 1944) 139 F.2d 961.

Accordingly judgment will be entered in favor of the defendant upon the deficiency assessments for the years 1955 and 1956, but judgment will be entered in favor of the plaintiffs insofar as those deficiencies cover the negligence penalty imposed by the Commissioner.