**John R. HUDSPETH, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**Roger HUDSPETH and Jamie Hudspeth, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**Ronald J. HUDSPETH and Jane Hudspeth, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**Nos. 73–1966 to 73–1968.**

United States Court of Appeals, Ninth Circuit.

Jan. 28, 1975.

Before CHAMBERS and HUFSTED-LER, Circuit Judges, and SOLOMON,[*] District Judge.

## OPINION

SOLOMON, District Judge:

Taxpayers[1] in these three cases, which were consolidated for trial, appeal from an adverse decision of the Tax Court of the United States. The Tax Court decision affirmed the determination of the Commissioner of Internal Revenue (Commissioner) that the taxpayers owed income tax deficiencies for 1966 of more than $3,500. The Tax Court held that they were not entitled to interest deductions under Section 163(a) of the Internal Revenue Code of 1954. This interest was purportedly paid under purchase money mortgages on land transferred to them in 1965 by their parents. The Court found there was no bona fide indebtedness upon which interest was due. We affirm in part and reverse in part.

In 1965, the parents owned more than 1,500 acres of land in Crook County, Oregon. This land was irrigated from a facility operated by the Bureau of Reclamation of the United States Department of Interior (Bureau). Under federal law, the quantity of federally irrigated land which can be owned by one person is limited to 160 acres; a husband and wife can own 320 acres.

No rules of attribution apply to members of a family. An owner of irrigated land in excess of the Bureau's limitation may therefore preserve ownership of the land within the family group as long as each family member does not own more than 160 irrigated acres. An owner of acreage in excess of 160 acres who fails to divest himself of the excess, could be compelled to sell the excess at a price appraised by the Bureau as dry land.[2] Irrigation service to the land will be

Herman Simon (argued), New York City, for petitioners-appellants.

Alfred S. Lombardi (argued), Tax Div., U. S. Dept. of Justice, Washington, D.C., for respondent-appellee.

---

[*] Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. The taxpayers are three brothers and the wives of the two married brothers. In this opinion "taxpayer" shall refer to the family unit, including the wife. Because this case involves transactions with parents, the taxpayers are also referred to as "the children."

2. The value of dry land is only a small fraction of the value of irrigated land.

withdrawn if the owner fails to dispose of the excess.

When the Bureau notified the parents that they had to dispose of their excess acreage, they consulted an attorney and a tax specialist. The parents could not make gifts to their children, the taxpayers here, because the parents did not have enough money to pay the gift taxes. The parents decided to sell 320 irrigated acres to each of the married sons and 160 acres to the single son. In May, 1965, the parents' attorney sent the children the documents necessary to accomplish the sale together with a letter from the parents explaining the land transfers. The children did not know of the transaction until they received the letter and documents.

Under the plan, the parents would deed the land to the children, the children would sign nonnegotiable notes and purchase money mortgages, and the children would lease the land back to the parents. The parents' letter explained that they intended to provide the children with the means to pay their notes. Specifically, the annual rent to be paid on the lease would be supplemented with annual cash gifts so that the total of these two amounts would cover the annual payments on the notes. The two married taxpayers would each owe $96,000 to be paid in $15,000 annual payments; the single taxpayer would owe $48,000 with $7,500 annual payments. These payments would include six per cent interest on the unpaid balance.

The leases were for 12 years. The married taxpayers were to receive $3,000 annual lease payments for the first eight years and $12,000 for the last four years. The single taxpayer was to receive $1,500 a year rent for the first eight years and $6,000 for the last four years. The parents, who were the lessees, had an option to renew the leases for an additional five years at $12,000 a year for the married taxpayers and $6,000 for the single taxpayer.

The children accepted the proposal and signed the documents.

In May, 1966, one year after the land sales, the parents' records show they received $3,000 from the married taxpayers and $1,500 from the single taxpayer; none of the taxpayers' bank account statements show these payments. These entries represented the parents' payment of rent to the taxpayers and the parents' receipt of partial mortgage payments from the taxpayers.

In December, 1966, the parents gave $12,000 to each married taxpayer and $6,000 to the single taxpayer. The taxpayers immediately deposited the parents' checks in their personal bank accounts and issued their checks to the parents for the same amount. Before they received the parents' check, no taxpayer had enough money in his account to cover his personal check. These check transfers, together with the May entries, satisfied the taxpayers' 1966 mortgage obligation.

On their 1966 federal income tax returns, the married taxpayers each reported $3,000 rental income, and the single taxpayer reported $1,500 rental income. Each taxpayer claimed as a deduction that portion of his annual mortgage payment which was allocable to interest on the indebtedness, in other words, $5,217 for the married taxpayers and $2,609 for the single taxpayer.

The parents, on their amended 1965 federal income tax return, filed in December, 1967, showed a profit of $140,215 on the land sales, but paid no tax because they had an operating loss of $534,572. On their 1966 return, they reported interest income of $5,217 from each married taxpayer and $2,609 from the single taxpayer; they paid no tax because they reported an operating loss of $453,150.

The Commissioner disallowed the taxpayers' interest deductions on the ground that there was no bona fide indebtedness. The Tax Court upheld that determination and the taxpayers appealed.

The Tax Court found that title to the property passed to the children but that the parents had intended to make gifts of the land to their children in install-

ments to take advantage of the annual gift tax exclusions under Section 2503(b) of the Internal Revenue Code. They adopted the plan previously described to carry out that objective. The Tax Court also found that the taxpayers' obligations to make mortgage payments probably would not have been enforceable if the parents failed to make the annual gifts. All parties knew that the taxpayers did not have enough money to make the annual mortgage payments, unless they received the annual gifts. The Tax Court concluded " . . . that [the taxpayers] were not parties to bona fide sales and that the amounts claimed as interest deductions were not paid on bona fide indebtedness."

We agree that title to the property passed to the children, but in our view it was by sale rather than gift. The sales price was $48,000 for the 160-acre tract and $96,000 for the 320-acre tracts. The parents, because of these sales and the leases, were legally obligated to make lease payments of $1,500 to the single taxpayer and $3,000 to the married taxpayers. The children were legally obligated to make the annual mortgage payments. If the payments were not made, the parents were privileged to foreclose the mortgages and recover the property. They could not have obtained deficiency judgments against their children because Oregon law does not permit deficiency judgments on purchase money mortgages.

The parents were under no legal obligation to continue to make annual gifts to the children although they expected to do it. The children's obligation to make the annual payments continued regardless of whether the parents made these gifts.

We affirm that part of the Tax Court decision which held that the portion of each mortgage installment which came from the exchange of checks in December, 1966, to and from the children was a gift and cannot be used as the basis for a deduction for interest by the children on their tax returns. Nevertheless, the gifts were effective to forgive the accrued interest which exceeded the amount of the lease payments and to reduce the principal by the balance. We hold, therefore, that the taxpayers were entitled to take deductions for interest of not to exceed the amount they received as lease payments.[3]

Affirmed in part and reversed in part. Remanded to the Tax Court for action consistent with this opinion.

---

**3.** For example, interest for one year on $96,000 is $5,760. A lease payment of $3,000 would all be applied to interest, leaving $2,760 of unpaid interest. The exchange of $12,000 checks wiped out the $2,760 interest and the balance of $9,240 would be applied on principal, leaving a balance of $86,760. The taxpayer could take a $3,000 interest deduction for that year. The interest for the next year would be $5,206, of which $3,000 would be paid from the lease money. $2,206 of the $12,000 gift would pay the rest of the interest and the principal would be reduced by $9,794 to $76,966. Again the taxpayer could deduct $3,000 for interest expense. He could deduct the $3,000 lease payment for interest each year until the interest on the principal became less than $3,000; then the deduction would be limited to the actual interest for that year.