ESTATE OF CHARLES T. FRANKLIN, DECEASED, SOUTHERN
CALIFORNIA FIRST NATIONAL BANK, TRUST DEPARTMENT,
EXECUTOR, AND MARGARET A. FRANKLIN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2126-73.    Filed July 30, 1975.

*Charles A. Pinney, Jr., Robert P. Simpson, William M. Schindler,* and *Richard L. Kintz,* for the petitioners.
*Robert E. Casey,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in Federal income tax due from the Estate of Charles T. Franklin, deceased, and Mrs. Margaret A. Franklin, petitioners:

| Year | Deficiency |
| --- | --- |
| 1968 | $13,376.99 |
| 1969 | 14,719.31 |

Certain concessions having been made, only one issue remains for our resolution: Are petitioners entitled to deductions for their distributive share of the losses reported by a limited partnership which entered into a contract with respect to the acquisition of a motel and related property? The answer depends on whether the obligations undertaken by the partnership were sufficiently definite and unqualified to constitute "indebtedness" within the meaning of section 163(a)[1] and cost basis for depreciation purposes as provided by section 167(g).

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

### FINDINGS OF FACT

Charles T. Franklin (hereinafter referred to as decedent) died on August 28, 1971. Southern California First National Bank, executor of his estate, maintained its principal place of business in San Diego, Calif., at the time the petition was filed. Petitioner Margaret A. Franklin is the surviving spouse of decedent, and she was a legal resident of La Mesa, Calif., at the time the petition was filed. Decedent and his wife filed a timely joint Federal income tax return for 1968 with the District Director of Internal Revenue, Los Angeles, Calif., and for 1969 with the Internal Revenue Service Center in Ogden, Utah.

Twenty-Fourth Property Associates (hereinafter the partnership or Twenty-Fourth) is a limited partnership formed on November 25, 1968, pursuant to the California Uniform Limited Partnership Act. The partnership was composed of one general partner, Jack R. Young & Associates (hereinafter JRYA), a California corporation, and eight limited partners. Decedent was one of these limited partners, who included seven medical doctors and one dentist.

The formation of Twenty-Fourth was evidenced by two documents, an "Agreement of Limited Partnership" (hereinafter the agreement) and a "Certificate of Limited Partnership of Twenty-Fourth Property Associates." The latter document was recorded with the appropriate office of the State of California. Both documents provided for the amendment of any provision by a majority vote of the limited partners.

The agreement recites that the purpose of the partnership was to acquire from Wayne L. and Joan E. Romney (hereinafter the Romneys or Wayne L. Romney singularly as Romney) real property, improvements, and certain personal property known as the Thunderbird Inn (sometimes referred to as the motel or property) in Williams, Ariz., and to lease the property back to the sellers or their nominee.

The agreement provides that six of the limited partners would contribute $10,000 each to the limited partnership, to be credited to their respective capital accounts, and a like amount towards the capital account of the general partner, JRYA. Two of the limited partners contributed $7,500 each to the partnership's capital and a similar amount to the capital account of JRYA. According to the agreement, contributions by the limited

partners towards the capital account of JRYA, amounting to a total of $75,000 (which JRYA withdrew before the end of 1968), were compensation for services to be rendered by JRYA to the partnership during its life. The other $75,000 was paid to the Romneys as prepaid interest pursuant to a "Sales Agreement," described later herein.

The agreement also provides that the life of the partnership shall be 25 years with earlier termination under circumstances enumerated in the agreement. Upon early termination of the partnership, nowhere does the agreement provide for a refund of any portion of the amount constituting prepaid management expenses.

Of the $75,000 withdrawn by JRYA from its capital account, $18,750 was paid by JRYA as commissions or finder's fees to the salesmen who arranged for the contributions of the limited partners, and approximately $50,000 was allocated by JRYA to services performed during the first year of the partnership. The amount left was to cover services to be performed over the remaining life of the partnership. These duties could include preparation of the partnership tax returns, any negotiations leading to a renewal of leases with respect to the acquired property or the refinancing of any mortgages, or any other disposition of the property owned by the partnership.

During a period extending from February through August 1968, the Romneys had purchased the stock of two corporations, Thunderbird Inn, Inc., and Thunderbird Hotels, Inc. The total purchase price for the stock of the two corporations was approximately $800,000.

The assets of Thunderbird Inn, Inc., included a 96-unit motel and related real property, a restaurant, and approximately 17 acres of unimproved land adjacent to the motel property. The assets of Thunderbird Hotels, Inc., comprised a cocktail lounge on the motel property and the liquor license for the lounge.

Thunderbird Inn, Inc., was dissolved by the Romneys on September 1, 1968, and the Romneys acquired all of its assets. Thunderbird Hotels, Inc., was not dissolved.

JRYA, on behalf of Twenty-Fourth, executed a "Sales Agreement" with the Romneys, dated November 15, 1968. The sales agreement recites that: "Seller [the Romneys] has this date sold to Buyer [the partnership] and Buyer has purchased from Seller" the real property, together with the improvements and personal

property, known as the Thunderbird Inn.[2] According to the sales agreement, the conveyed property included all personal property located on the premises except the liquor license and certain inventory. The sales agreement did not cover the 17 acres adjacent to the motel.

In negotiating the sales agreement for the Thunderbird Inn, Romney and Jack R. Young, representative of JRYA (hereinafter Young), utilized an appraisal report, prepared in May 1968 at Romney's request, by Ralph W. Jenkins, who died several years prior to the trial. Young never had an independent appraisal made for the benefit of JRYA.

Young was not personally familiar with the property which he purported to purchase on behalf of Twenty-Fourth. He did not visit the property, but a Mr. Darling, then president of JRYA, who was not a real estate appraiser, visited the motel and gave Young a general report on its condition. Young did not make an effort to determine the age of the property improvements which are the subject of the sales agreement.

The total sales price stated in the sales agreement was $1,224,000, plus interest on the unpaid balance at the rate of $7\frac{1}{2}$ percent per annum, payable in monthly installments of principal and interest of $9,045.36 for a period of approximately 10 years.

The sales agreement also recites that a payment, described as prepaid interest and in the amount of $75,000, as mentioned in our earlier discussion of the partnership agreement, was payable upon the signing of the agreement, and this payment was made.

At the time of the execution of the sales agreement, there was a first mortgage on the property in the approximate amount of $235,000, and a second mortgage in the approximate amount of $550,000 was in the process of being placed on the property. These encumbrances remain the sole obligation of the Romneys under the sales agreement until the end of the 10-year period, at which time, if the transaction is completed, Twenty-Fourth is to assume them.

At the expiration on January 15, 1979, of the 10-year period, a payment equal to the "Seller's equity" will be due. The sales agreement defines "Seller's equity" as the difference between the outstanding encumbrances and the principal balance due and owing under the terms of that agreement. At the time of the

---

[2] The record does not establish whether the cocktail lounge, an asset of Thunderbird Hotels, Inc., was transferred pursuant to the sales agreement.

execution of the sales agreement, it was estimated that at the end of the 10 years, the unpaid principal balance would equal approximately $975,000.

The sales agreement further provides:

> Buyer is purchasing the property described in Exhibit "A" together with the improvements situated thereon and the furnishings and fixtures located therein, subject to the existing indebtedness thereon, and is not assuming any of said indebtedness, and Buyer's liability and obligation hereunder shall be limited to its investment in the property in accordance with the terms and provisions of this Agreement, and there shall be no personal liability on the part of Buyer, nor may any deficiency be assessed against the Buyer, and Seller will be limited to forfeiting out Buyer's interest in the real property, improvements and personal property if the payments are not made by Buyer as called for under the terms and provisions of this Agreement, and nothing herein contained shall be construed as obligating Buyer to assume the mortgages or other obligations of record, as set forth in Schedule "A" nor is Buyer or Buyer's nominees or assignees assuming any mortgages, leases, notes or other obligations, and if Buyer fails to make the payments herein called for under Paragraph 2 hereof, Seller is limited to look solely to the real and personal property involved in this transaction, and Buyer, or Buyer's nominees or assigns shall have no personal liability or obligation hereunder.

The sales agreement was recorded in the Office of the Recorder of Coconino County, Ariz.

Twenty-Fourth, through its general partner, and the Romneys opened an escrow with Southern California First National Bank, San Diego, Calif., and deposited therein the sales agreement, a warranty deed from the Romneys to the partnership, a bill of sale from seller to buyer and one from buyer to seller covering the personal property located in the motel, and a quitclaim deed from the partnership to the Romneys, all of which were called for by the sales agreement. The sales agreement recites that upon full payment of the purchase price, all of these documents are to be delivered by the escrow agent to Twenty-Fourth. The sales agreement further states that upon a default by Twenty-Fourth under the sales agreement and upon the Romneys' electing to forfeit Twenty-Fourth's interest in said real property, all the documents are to be delivered by the escrow agent to the Romneys.

As to the personal property, furnishings, and fixtures in the motel, the sales agreement provides:

> The Parties agree that most if not all of the personal property, fixtures and equipment will have to be replaced in the normal course of events during the life of the Agreement and before the full purchase price has been paid, and the Parties agree that such furnishings and fixtures may be replaced so long as a

proper inventory is maintained of all replacements, and in the event Buyer's interest in the property should hereafter be forfeited out, Seller will be entitled to retain all of the personal property, furnishings and fixtures in the premises at the time such forfeiture may become effective. If Buyer pays the full purchase price as called for herein, then said personal property shall become the property of Buyer.

Concurrently with the execution of the sales agreement, the parties executed a document entitled "Lease," which reflects that Twenty-Fourth as landlord leased the property, subject to the sales agreement, to the Romneys as tenants for a term of 10 years commencing on November 15, 1968. The lease authorizes the Romneys to use the premises "for any lawful purpose other than a dangerous or noxious trade or business." The rental under the lease is $1,435 per month for the first 9 months, $2,532 for the 10th month, and $9,045 per month for the remaining term of the lease. These rental payments approximate the payments due for the same period under the sales agreement after the buyer is credited with the $75,000 described as prepaid interest in the sales agreement.

Under the terms of the lease, the Romneys are to pay all utilities and real property taxes and other taxes, assessments, rents, charges, and levies "(general and specific, ordinary and extraordinary, or [sic] every name, nature and kind whatsoever)." They are also, at their "sole cost and expense," to keep and maintain the premises in good repair, expressly "waiving any or all right or law to make repairs at the expense of Landlord," and "shall make all necessary or appropriate repairs, replacements, renewals and betterments of such improvements, structural and nonstructural, ordinary and extraordinary, and foreseen and unforeseen." In addition, the Romneys, at their "sole cost and expense," are to maintain fire, extended coverage, and other casualty insurance as well as liability insurance as to the subject property. The instrument, described as a "net lease," further provides that the Romneys are to hold the partnership harmless from all the foregoing or any other liabilities.

The lease recites the fact that Twenty-Fourth and the Romneys are also parties "to a Sales Agreement" in which they are buyer and seller, respectively. The lease provides that if the Romneys default on their obligations as seller under the sales agreement by failing to pay and discharge the underlying encumbrances according to the terms thereof, Twenty-Fourth at

its option may consider the Romneys in default under the lease, may suspend its payments under the sales agreement, and may make payments on the underlying encumbrances directly for its own benefit and not that of the Romneys.

Early in 1969, the Romneys reorganized their interest and formed Romney International Hotels, Inc. (RIH), to which the motel property was transferred. Approximately one-third of the stock in RIH was issued to JRYA.

On July 15, 1970, Twenty-Fourth and RIH entered into a "Corrected Sales Agreement" for the purpose of correcting the legal description contained in the original sales agreement. The corrected sales agreement was also recorded, and RIH deposited into escrow a new warranty deed and Twenty-Fourth deposited a new quitclaim deed, both also dated July 15, 1970, containing the corrected legal description and replacing those like documents originally placed in escrow.

In March of 1971, RIH borrowed $500,000 from Western Financial Corp. for the purpose of constructing capital improvements on a number of its hotel properties, which may or may not have included the motel property here in controversy. To secure this loan, RIH, as mortgagor, executed a real estate mortgage in favor of Western Financial Corp., encumbering the subject property. This $500,000 was not used solely to improve the property described in the sales agreement.

On June 21, 1973, Twenty-Fourth and RIH entered into an "Addendum to Lease," which modified the original lease to set forth the terms for the construction and financing of capital improvements on the property, including the purchase of real property to "expand" the motel. The addendum allows the Romneys to propose new capital improvements, in which case Twenty-Fourth at its option can either construct the improvements itself and increase the rent charged to the Romneys or can allow the Romneys to construct the improvements. In the event that the Romneys construct the improvements and/or acquire additional real property, Twenty-Fourth is to purchase them, if its interest is not forfeited pursuant to the sales agreement, at their original costs plus 10 percent of such determined costs, less an allowance for depreciation, and in addition shall purchase at its fair market value any real property acquired in order to expand the motel.

No payments have been actually made under either the sales agreement or the lease. Instead, entries have been made by both parties in books of account which are reconciled annually. Up to the date of the trial, no money other than Twenty-Fourth's original $75,000 payment to the Romneys had changed hands between the parties.

Young, the representative of JRYA who negotiated the agreements on behalf of Twenty-Fourth, was well acquainted with the Romneys. From 1967 to 1971, the Romneys and Young, or JRYA, were involved in approximately 49 transactions involving motor hotels and apartment houses. During November 1968, the same month as the various original agreements herein were executed, the Romneys and Young were involved in transactions involving two other motel properties. All of those transactions were structured in a manner similar to the transaction herein at issue.

Decedent purchased his percentage interest in Twenty-Fourth from Leo E. Shaw (hereinafter Shaw). Shaw sold partnership interests to six of the eight limited partners of Twenty-Fourth. He showed potential investors, including decedent, the following projection prepared by an accounting firm:

FORECAST OF OPERATIONS
ROMNEY THUNDERBIRD—WILLIAMS, ARIZONA

| | | |
|---|---|---|
| Purchase price | $1,224,000 | |
| Terms | 75,000 | prepaid interest on purchase |
| | 1,224,000 | contract of sale |
| | | 7 ½% interest |
| | | 25-year amortization, balance at |
| | | end of 10 years due at that time |
| Depreciation | 800,000 building | 25-year life—no salvage value |
| | 326,000 furnishings | 5-year life—no salvage value |
| | 98,000 land | Not depreciable |

150% declining-balance method, changing to straight-line method for furnishings in 1971 (change requires filing of Form 3115 with the Internal Revenue Service by Mar. 31, 1971).

Purchase date        Nov. 15, 1968

| | Lease income | Contract amortization | | |
| | | Interest | Principal | Balance |
|---|---|---|---|---|
| 1968 (2 months) | $2,800 | $75,000 | $2,800 | $1,221,200 |
| 1969 | 48,800 | 31,300 | 17,500 | 1,203,700 |
| 1970 | 108,550 | 89,550 | 19,000 | 1,184,700 |
| 1971 | 108,550 | 88,250 | 20,300 | 1,164,400 |
| 1972 | 108,550 | 86,550 | 22,000 | 1,142,400 |
| 1973 | 108,550 | 84,850 | 23,700 | 1,118,700 |
| 1974 | 108,550 | 83,050 | 25,500 | 1,093,200 |
| 1975 | 108,550 | 81,050 | 27,500 | 1,065,700 |
| 1976 | 108,550 | 78,950 | 29,600 | 1,036,100 |
| 1977 | 108,550 | 76,650 | 31,900 | 1,004,200 |
| 1978 (10 months) | 90,500 | 62,000 | 28,500 | 975,700 |

| | Depreciation | | | Contract interest | Indicated income (loss) |
| | Building | Furnishings | Total | | |
|---|---|---|---|---|---|
| 1968 (2 months) | $8,000 | $16,300 | $24,300 | $75,000 | ($96,500) |
| 1969 | 47,500 | 92,900 | 140,400 | 31,300 | (122,900) |
| 1970 | 44,700 | 65,000 | 109,700 | 89,550 | (90,700) |
| 1971 | 42,000 | 53,600 | 95,600 | 88,250 | (75,300) |
| 1972 | 39,500 | 53,600 | 93,100 | 86,550 | (71,100) |
| 1973 | 37,100 | 44,600 | 81,700 | 84,850 | (58,000) |
| 1974 | 34,900 | | 34,900 | 83,050 | (9,400) |
| 1975 | 32,800 | | 32,800 | 81,050 | (5,300) |
| 1976 | 30,800 | | 30,800 | 78,950 | (1,200) |
| 1977 | 29,000 | | 29,000 | 76,650 | 2,900 |
| 1978 (10 months) | 22,700 | | 22,700 | 62,000 | 5,800 |

This projection indicates that decedent's distributive share of the alleged losses of Twenty-Fourth would equal $78,684 by 1974 and would total $79,763 by 1978. No cash flow would be generated by the operations of Twenty-Fourth during the 10-year period covered by the lease.

Decedent and his wife reported $22,244 and $16,583 as their distributive share of the losses of Twenty-Fourth for 1968 and 1969, respectively. Respondent disallowed these deductions, determining in the notice of deficiency that petitioners had established neither the nature nor the extent of the losses.

### OPINION

Petitioners contend that Dr. Franklin, as a member of the partnership, Twenty-Fourth, was entitled to deduct his distributive share of the partnership losses. Sec. 702(a); sec. 1.702-1, Income Tax Regs. Those losses were composed of the annual excess of the

interest on the stated gross purchase price plus the depreciation deductions claimed on the motel property over the rent specified in the lease. Respondent makes two arguments. First, he maintains that the purported sale and leaseback of the motel was a "sham" transaction without any legal or economic purpose or motive other than tax avoidance.[3] Alternatively, respondent contends that the partnership could decide at the end of the 10 years whether to complete the purchase or "walk away" from the deal without any further liability and that the partnership thus obtained only an option to buy the motel property. Consequently, according to respondent's view, Dr. Franklin as a member of the partnership is not entitled to any partnership loss deductions during the years in issue.

Section 163(a)[4] allows a deduction for "interest paid or accrued within the taxable year on *indebtedness.*" (Emphasis supplied.) An indebtedness is an existing, unconditional, and legally enforceable obligation for the payment of a principal sum. See, e.g., *Gilman v. Commissioner,* 53 F.2d 47, 50 (8th Cir. 1931), affg. 18 B.T.A. 1277 (1930); *Sterling G. Howlett,* 56 T.C. 951, 960 (1971); *George T. Williams,* 47 T.C. 689, 692 (1967), affd. 409 F.2d 1361 (6th Cir. 1968), cert. denied 394 U.S. 997 (1969). Depreciation deductions are designed to compensate an investor in property for the economic loss attributable to the property's deterioration through exhaustion, wear and tear, and obsolescence. They are computed with reference to a taxpayer's adjusted basis for the purpose of determining gain or loss on the sale or other disposition of property. Sec. 167(g).[5] Such adjusted basis, in a case like the present one, depends initially upon the

---

[3] While the tax savings sought by petitioners are considerable, respondent errs in placing such heavy emphasis on the tax results Dr. Franklin and the other limited partners sought to achieve. See *City Investing Co.,* 38 T.C. 1, 9 (1962). They were entitled to take advantage of the tax-saving opportunities offered by the statute dealing with partnership losses. See *Gregory v. Helvering,* 293 U.S. 465, 469 (1935). However, they must show that, in substance and not merely in form, they actually did what they purported to do.

In addition, petitioners correctly point out that the tax benefits of the depreciation deductions are substantially tempered by secs. 1245 and 1250, relating to the recapture of depreciation deductions.

[4] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

[5] SEC. 167. DEPRECIATION.

(g) BASIS FOR DEPRECIATION.—The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property.

cost of the property. Secs. 1011 and 1012.[6]

We hold for respondent. We think any obligations to pay the purchase price stated in the sales agreement signed November 15, 1968, when read in the light of the contemporaneously executed lease and the surrounding circumstances, were not legally enforceable or were too indefinite and tentative to create "indebtedness" within the meaning of section 163(a) or give the partnership a cost basis under section 167(g) and related provisions. At best, the substance of the transaction here in dispute was to give the partnership an option to buy the motel property on January 15, 1979, and no earlier, at a computable price.[7] Consequently, petitioners are not entitled to the claimed deductions.

An option to purchase property does not create an enforceable obligation to pay the purchase price or give the taxpayer a cost basis for the property. "It is simply a contract by which the owner of property agrees with another person that the latter shall have the right to purchase the property at a fixed price within a certain time." *Graney v. United States*, 258 F.Supp. 383, 386 (S.D. W.Va. 1966), affd. per curiam 377 F.2d 992 (4th Cir. 1967), cert. denied 389 U.S. 1022 (1967). It gives the optionee no present estate, see *Richardson v. Hardwick*, 106 U.S. 252, 254 (1882), and imposes on him no obligation to consummate the transaction. He has the choice of exercising the option or allowing it to lapse. See *United States Freight Co. v. United States*,

---

[6] SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) GENERAL RULE.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016.

SEC. 1012. BASIS OF PROPERTY—COST.

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

Nothing in subch. K, applicable to the instant case, provides otherwise.

[7] Under this view, the limited partners may be entitled to a deduction, under sec. 1234(a), for the $75,000 paid for the option if it is not exercised in 1979. It may be that the transaction was a "sham," as argued by respondent, in the sense it was not a bona fide sale of the motel but, in substance, was a scheme whereby the limited partners would pay $150,000 for interest and depreciation deductions totaling nearly $530,000 and, presumably, the Romneys would deduct the purported rent and report the same amounts as capital gain on the installment basis. The sham theory, however, makes no provision for the tax treatment of the purported $75,000 advance interest payment.

190 Ct.Cl. 725, 738-739, 422 F.2d 887, 894-895 (1970); see also *Russell v. Golden Rule Mining Co.,* 63 Ariz. 11, 159 P.2d 776 (1945). If an option is not exercised, the optionor becomes entitled to keep only the amount paid as consideration for granting the option (the tax consequences being controlled by section 1234) and has no enforceable right of action against the optionee for damages. *United States Freight Co. v. United States,* 190 Ct.Cl. at 739-740, 422 F.2d at 895.

A contract of sale, in contrast, carries mutual obligations on the part of the seller to sell and the buyer to buy. See *W. A. Drake, Inc. v. Commissioner,* 145 F.2d 365, 367 (10th Cir. 1944), affg. 3 T.C. 33 (1944); *Lawler v. Commissioner,* 78 F.2d 567, 568 (9th Cir. 1935). It "is a contract 'to pass rights of property for money,—which the buyer pays or promises to pay to the seller.' " *Commissioner v. Brown,* 380 U.S. 563, 571 (1965). The purchaser in such a bilateral contract is liable for full contract damages if he fails to perform. *United States Freight Co. v. United States,* 190 Ct.Cl. at 739-740, 422 F.2d at 895. Accordingly, a contract of sale imposes an enforceable obligation to pay the purchase price, which will support interest deductions and give the purchaser a cost basis in the property on which depreciation is allowable.

Whether the several agreements in the instant case are to be construed as constituting an option or a contract of sale depends not upon any particular phraseology used in the documents but rather upon what the parties actually did, gleaned from a consideration of the written instruments (both the sales agreement and the lease) in their entirety and the surrounding circumstances. Cf. *Lazarus v. Commissioner,* 513 F.2d 824 (9th Cir. 1975), affg. 58 T.C. 854 (1972). True, the sales agreement contains language ordinarily found in a contract of sale, but the technical niceties of conveyancing will not suffice. When the sales agreement is read with the contemporaneously executed lease, in the light of the record as a whole, the arrangement has the characteristics of an option. We think those characteristics clearly predominate. We base our conclusion on the *totality* of the following considerations:

First, the sales agreement purports to create an obligation on the partnership to pay a sales price of $1,224,000 but, in fact, the true price is to be computed according to a carefully prescribed formula as of January 15, 1979. On that date the partnership may

elect to consummate the transaction or withdraw from it. The sales price as of that date is to consist of two elements:

(1) The balance then due on a first mortgage dated May 17, 1961 (on which approximately $235,000 was owed as of November 15, 1968), a second mortgage which the Romneys were in the process of obtaining when the sales agreement was signed (with a balance of approximately $550,000 at that time), and any other mortgages as might be placed later by the Romneys on the property or its fixtures, furnishings, and improvements. The partnership did not assume these mortgages when the sales agreement was signed but agreed to "assume the outstanding mortgages and encumbrances or [sic] record against the property (including mortgages on the furnishings and fixtures and the improvements, if any)" if the balance of the full purchase price was paid on January 15, 1979; and

(2) The "Seller's equity," defined as "the difference between the outstanding encumbrances as of the date of the computation of the equity and the principal balance due and owing under the terms and provisions" of the sales agreement as of the date in January 1979 "when the balance of the purchase price is to be paid." The "principal balance due and owing" on January 15, 1979, shown on the accountant's forecast as $975,700 as of November 15, 1978, is to be computed by starting with the stated purchase price of $1,224,000. From this amount are to be subtracted the credits against principal included in the monthly amortization "payments" of $9,045.36, scheduled to have begun 1 month after the sales agreement was signed on November 15, 1968, with interest on the "unpaid balance" computed at $7\frac{1}{2}$ percent per annum.

The monthly "payments," which were to serve to reduce the purchase price, have never been made and, we infer, were never intended to be made. The partnership has no funds of any sort with which to make the monthly payments.[8] The contemporaneously executed lease called for rental payments equal to the amortization payments under the sales agreement.[9]

---

[8] The $75,000 prepayment of interest to the Romneys and the withdrawal by JRYA of the $75,000 credited to its account completely exhausted the $150,000 invested in the limited partnership by the eight limited partners. The partnership agreement contained no provision obligating the partners to make any further contributions.

[9] As detailed in our Findings, the sales agreement called for an initial $75,000 payment to the Romneys, the only payment they ever received from the partnership, and provided that such payment "shall be construed and accepted by Seller as a prepayment and an advance payment of interest." The rental payments called for in the lease for the first 10

Instead of actually making the so-called rental payments and purported amortization payments, however, the Romneys and the partnership merely made offsetting bookkeeping entries on their respective records, reflecting monthly payments of the rent under the lease and monthly "installments" under the sales agreement.[10] Not since the initial $75,000 prepaid interest payment has any money changed hands between the parties.

Thus, the only economic effect (other than claimed tax consequences) between December 15, 1968, the due date of the first payment, and January 15, 1979, of the so-called rental payments and purported amortization payments is to provide a mathematical formula for computing the price for which the partnership will be entitled to elect or not to purchase the motel on the latter date. A wide variety of figures could have been used in that formula for the interest rate, monthly amortization, and corresponding rental payment factors in order to produce the January 1979 option price. Since the purported rental and amortization payment figures actually used were only bookkeeping entries, the stated purchase price of $1,224,000 is meaningless. The only price of any legal or economic significance is the figure computable as of January 1979 under the prescribed formula.

Second, and of major importance, neither the sales agreement nor the lease obligates the partnership to buy the motel or pay anything in the way of damages if it fails to do so.[11] In one provision the sales agreement appears to obligate the partnership to make the $9,045.36 monthly amortization payments beginning on December 15, 1968, and to pay the "principal balance due and owing" on January 15, 1979. But a further provision, quoted in our Findings, makes it explicitly clear that

months were adjusted by this $75,000 so that, over the entire term of the lease, the total rental payments and the total amortization payments were about the same. The record does not explain why the rent payable by the Romneys for the first 10 months should have been adjusted by this $75,000 if it was, in fact, merely a prepayment of interest on the purported purchase price of the motel property.

[10] *Hudspeth v. Commissioner*, 509 F.2d 1224 (9th Cir. 1975), on which petitioners rely to minimize the importance of this fact, is clearly distinguishable from the instant case.

[11] Petitioners' reply brief appears to concede that the partnership's agreement was not subject to specific performance. In *People v. Ocean Shore R. Co.*, 90 Cal.App.2d 464, 203 P.2d 579, 583 (1st Dist. Ct. App. 1949), the court said:

"The test of whether an instrument is an option or a contract of sale is whether there is such an obligation on the part of the holder to buy that it can be enforced by specific performance. * * * "

the partnership's liability is limited to a forfeiture of its rights under the sales agreement and that the partnership shall have no other liability of any kind. Thus, if the partnership fails to consummate the sale, it will lose only its rights under the contract to buy the motel property on January 15, 1979, at the computable price. It cannot be compelled to assume the mortgages or pay any other portion of the option price. These facts bring the case within the rule of numerous decisions holding that a distinguishing characteristic of an option is that it imposes no obligation on the optionee to complete the transaction. *Richardson v. Hardwick,* 106 U.S. at 254-255; *Commissioner v. Stuart,* 300 F.2d 872, 875-876 (3d Cir. 1962); *Lawler v. Commissioner,* 78 F.2d at 569; *Suburban Imp. Co. v. Scott Lumber Co.,* 59 F.2d 711, 715 (4th Cir. 1932); *Graney v. United States,* 258 F.Supp. at 386; *People v. Ocean Shore R. Co.,* 90 Cal.App. 2d 464, 203 P.2d 579, 583 (1st Dist. Ct. App. 1949); *Stelson v. Haigler,* 63 Colo. 200, 165 P. 265, 268 (1917); 1 Williston, Contracts, sec. 61A, pp. 198-199 (3d ed. 1957).[12]

Petitioners argue that the partnership acquired equitable title to the motel property which the partnership is required to forfeit if it "defaulted" and that the transaction was no different from any other nonrecourse purchase. True, the sales agreement required the Romneys to deposit with an escrow agent a warranty deed covering the real property and a bill of sale covering the personalty. But the partnership was to deliver to the escrow agent documents which canceled the warranty deed and bill of sale: a quitclaim deed and a bill of sale reconveying the personalty to the Romneys and the sales agreement, which provides that "in the event Buyer's interest in the property should hereafter be forfeited out, Seller will be entitled to retain all of the personal property, * * * in the premises at the time such

---

[12] The sales agreement provides that Arizona law is to control its interpretation, and the law in that State was stated as follows in *Russell v. Golden Rule Mining Co.,* 63 Ariz. 11, 159 P.2d 776, 782 (1945), where the optionee was required to make a series of payments to keep an option open:

"It is only where the purchaser is bound to pay the purchase price than [sic] an agreement can be construed as a contract of sale. * * * In its inception the * * * contract [in dispute] is merely an agreement by the first party to sell and convey his interest within a specified time, if the payments and full consideration as mentioned therein are made within that time. It is a mere option or a contract to sell. The second parties do not bind themselves in all events to make the payment. Such payments must be made from time to time to keep the option agreement operative. * * * The instrument is referred to as a contract of sale, but in reality it is only an option of sale, or a contract to sell. * * * If it does not bind the second parties to pay the purchase price it is an option. * * * "

forfeiture may become effective." Only the sales agreement was to be recorded, and in case the partnership does not complete the transaction, all of these documents, including the quitclaim deed, are to be delivered to the Romneys. No evidence of title is to be delivered to the partnership unless and until the purchase price is paid in January 1979.

True, also, the sales agreement refers to the Romneys as the "Seller" and to the partnership as the "Buyer" and recites that "Seller has this date sold to Buyer and Buyer has purchased from Seller" the real and personal property, including improvements, comprising the motel. Language of this sort is ordinarily used only in bilateral sales agreements. *Treadway v. Western Cotton Oil & Ginning Co.,* 40 Ariz. 125, 10 P.2d 371 (1932). But where such language appears in an instrument, and other provisions of the agreement permit the buyer to withdraw and incur no liability other than his initial payment, the agreement may constitute an option. *Lawler v. Commissioner,* 78 F.2d at 569; *Russell v. Golden Rule Mining Co.,* 159 P.2d at 782.

Moreover, as a matter of economic reality, petitioners have not shown they had anything of value to forfeit, other than the option rights. As discussed above no actual payments, except the $75,000 initial prepaid interest payment, were ever made to the Romneys. The "equity" buildup allegedly attributable to the amortization payments was illusory. Petitioners have not shown that the purported sales price of $1,224,000 (or any other price) had any relationship to the actual market value of the motel property or that the purported rent had any realistic relationship to the fair rental value of the motel property.[13]

Also, petitioners presented no expert testimony as to the value of the motel property. Nor did they show its earnings history or evidence of comparable sales on which the Court could base an independent valuation. The record shows that during the period

___

[13] Petitioners offered an error-filled, sketchy appraisal report prepared for Romney at his expense by one Ralph W. Jenkins, now deceased, but Jenkins' opinions could not be subjected to the purifying tests of cross-examination. The report is obviously suspect because of Romney's participation with Young or JRYA in approximately 48 other similar transactions. The report was admitted for the limited purpose of showing that Young had the appraisal report when he and Shaw sold the transaction to the limited partners. Young testified that a Mr. Darling, one of his associates, visited the property, but Darling is not an appraiser. And, significantly, he did not testify at the trial. *Wichita Term. El. Co. v. Commissioner,* 162 F.2d 513, 515 (10th Cir. 1947). Young's summary of the information obtained by Darling was very general. Petitioners offered no credible evidence on this important issue as to the correlation of the purported purchase price of $1,224,000 with the value of the property. In this connection, see secs. 704(d) and 752(c).

from February through August 1968, the Romneys had bought the stock of two corporations, one of which owned the motel, for approximately $800,000 and that about $660,000 of that purchase price was allocable to the assets purportedly sold to the partnership. The previous owner, Thunderbird Inn, Inc., the Romneys, and their successor-in-interest have maintained insurance policies on the property in the respective amounts of $583,200, $700,000, and $614,000, covering periods from May 1967 to January 1, 1974. From those raw facts, however, we cannot estimate the property's value.

Indeed, the parties proceeded as if they had no concern about whether the purchase price or rental rate accurately reflected the value of the property or its use. Shaw and Young, who sold the deal to Dr. Franklin and the other limited partners, never visited the premises, and it was not shown that Dr. Franklin or any of the other limited partners did so either or that any of them engaged legal counsel or consulted experts before entering into this huge transaction. The record contains no indication that the partners ever attempted to formulate a judgment as to the probable January 15, 1979, value of the motel or even inquired as to the age of the building in 1968, the suitability of its location for motel use, the prospective highway construction and its effect on the motel, the effect of 10 years of additional use and deterioration, the motel's earnings history, and the like. We are not satisfied, as a matter of economic reality, that the partnership has any equity to forfeit in the case of its failure to pay the purchase price or that the partners ever intended to complete the purchase.

Third, the sales agreement and the lease did not transfer the burdens and benefits of ownership of the motel. Cf. *Ted F. Merrill*, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). Possession of the motel property was never actually transferred to the partnership. The 10-year lease, executed contemporaneously with the sales agreement, left the Romneys in possession of the property with the right to use the premises "for any lawful purpose other than a dangerous or noxious trade or business." To the same extent as any owner, the Romneys continue to be liable under the lease for the payment of taxes, assessments, charges, and levies of all kinds. They are required, at their own expense, to keep and maintain the premises in good order, condition, and repair, "waiving any or all right or

law to make repairs at the expense of Landlord [the partnership]." They are also required, at their own expense, to maintain casualty and liability insurance and to save the partnership "harmless from and against all * * * obligations of every kind and nature whatsoever related to the said premises or the improvements thereon which may arise or become due during the term of this Lease." [14] And they have no right to terminate the lease by reason of any "event, occurrence, or situation during the term of this Lease whether foreseen or unforeseen, and however extraordinary." [15]

Nor did the Romneys relinquish their right to purchase and install new personal property, fixtures, or equipment in the same manner as any owner. The sales agreement recites that most, if not all, of such items will have to be replaced during the life of the agreement. In the event the partnership's interest in the property is forfeited out, the Romneys will be entitled to retain all replacements of furnishings and fixtures. If the partnership pays the full purchase price, including an adjusted cost of such items, then such personal property shall become the property of the partnership.

Indeed, by an addendum to the lease executed in June 1973, RIH, successor-in-interest to the Romneys, was permitted to construct capital improvements on the property at its sole cost and expense and to acquire additional real property to expand the motel operation. If the partnership's interest is not forfeited pursuant to the sales agreement, Twenty-Fourth is to purchase such improvements, in accordance with a prescribed formula, along with any additional real property so acquired. Otherwise, the Romneys will continue to own them. The partnership may pay the purchase price for such improvements and additional real property in cash or by assuming any liens placed on the property by the Romneys.[16]

---

[14] Petitioners contend that the Romneys gave up the benefits of ownership of the motel property, "the most important of which is the right to dispose of the property and participate in any appreciation in value of the property." But any optionor, by granting the option, relinquishes the same rights.

[15] Petitioners seek to dismiss these provisions on the ground that the arrangement was a so-called net lease. But that argument ignores the fact that the lease was actually part of the contemporaneously executed purported sales agreement. The two instruments are interdependent and, as a matter of reality, cannot be separated. The argument thus assumes the point in issue. The rights, powers, and obligations retained by the Romneys far exceed those customarily granted in a net lease.

[16] Petitioners argue that: "The mere fact that Romney found it necessary to seek" the addendum to the lease shows "that the parties treated * * * [the partnership] as the owner

Petitioners contend the transaction was not an option on the ground that "the unpaid balance of the purchase price bears interest during the ten year period" and requires a balloon payment measured by "the difference between the unpaid contract balance ($975,000) and the underlying encumbrances." But this argument presupposes the conclusion that the transaction was a sale. The so-called balloon payment mentioned above is merely the price at which the partnership was given the option to buy the property on January 15, 1979.

Citing *Crane v. Commissioner*, 331 U.S. 1 (1947); *David F. Bolger*, 59 T.C. 760 (1973); and *Manuel D. Mayerson*, 47 T.C. 340 (1966), petitioners contend that a nonrecourse obligation to pay the purchase price of property constitutes indebtedness for the purposes of interest deductions under section 163(a) and represents cost for depreciation basis purposes under section 167(g). The *Crane* case held that a taxpayer's basis in inherited property included the amount of an unassumed mortgage. *Bolger* held that the taxpayer's basis included the amount of notes and mortgages given by a corporation on the acquisition of property which was transferred to the taxpayer without his assuming any liability on the notes or mortgages. *Mayerson* held that a taxpayer's basis for purchased property included the amount attributable to a mortgage for which the taxpayer had no personal liability. Petitioners maintain that in the instant case, the limitations on the partnership's obligations under the sales agreement were similar nonrecourse obligations and, accordingly, support the claimed deductions.

Those three cases, however, are not apposite. In none of them was there any doubt as to the character or viability of the mortgage obligations originally given to secure the purchase price of the property. The issue was the effect of the absence of personal liability on the mortgages after the property changed hands. None of them involved a formula like the one used in the

of the property." To the contrary, the Romneys needed the addendum so that the option price would reflect their outlays for the improvements and additions. An optionor would not make improvements unless he was assured the option price would be adjusted. The beneficial control retained by the Romneys over the property is graphically illustrated by our Findings on the $500,000 mortgage in favor of Western Financial Corp., placed against the property in 1971 by RIH, the Romneys' successor-in-interest. The loan secured by this mortgage was used by RIH to make capital improvements on a number of its hotel properties which, according to the testimony, may or may not have included the one here in issue.

instant case for computing the actual purchase price 10 years later, when the partnership will be given the choice of completing the transaction or walking away from it. None of them involved a purported seller who remained in possession and who could, and did, continue to manage, use, improve, and add to the property at his own expense. None of them involved a purported initial sales price having no correlation with the property's value. None of them involved a transaction which in substance was a mere option to purchase the property at a later date. When all the facts of the instant case are considered, it is clear that those cases are distinguishable.

In summary, as we view the entire record, the sales agreement and the lease—when read together and in the light of all the facts—are incompatible with a sale. At most they give the partnership an option to buy the motel property on January 15, 1979. The obligations undertaken by the partnership are too contingent and indefinite to constitute indebtedness within the meaning of section 163(a) or cost for the purpose of computing a basis for depreciation under section 167(g). We are not satisfied that the partnership has any investment in the motel property or that it will suffer any economic loss as that property deteriorates over the 10-year period covered by the purported sales agreement and lease. Accordingly, the estate of Dr. Franklin, who was a member of the Twenty-Fourth partnership, and his surviving spouse are not entitled to deductions under section 702(a)(9) for their distributive share of an alleged partnership loss.

*Decision will be entered under Rule 155.*