ANTONIO I. RAMIREZ and JEAN M. RAMIREZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ramirez v. Commissioner
Docket No. 15008-79.
United States Tax Court
T.C. Memo 1982-608; 1982 Tax Ct. Memo LEXIS 139; 44 T.C.M. (CCH) 1431; T.C.M. (RIA) 82608; October 19, 1982. David A. Webster and James A. Urban, for the petitioners. Roger Osburn, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1975
$14,432
1976
9,154
1977
7,692
The issue for decision is whether petitioners are entitled to an investment credit and miscellaneous deductions claimed in connection with an investment in a cattle breeding program. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Antonio I. Ramirez (hereinafter petitioner) and Jean M. Ramirez, husband and wife, resided in Kissimmee, Florida, when they filed their 1975, 1976, and 1977 joint Federal income tax returns with the Office of the Director, Southeast *141 Internal Revenue Service Center, Chamblee, Georgia, and when they filed their petition in this case. General Background
Petitioner is a general surgeon, and his wife is a registered nurse. In 1971, petitioner and his wife acquired 200 acres of improved farmland in Deland, Florida. This land is comprised of approximately 40 acres of wooded land, 40 acres of improved pasture which is used for grazing commercial cattle, and 100 acres of land that is used for growing hay part of the year and grazing the remainder of the year. [1] In 1972, petitioner and his wife began raising commercial angus cattle on this property. They started with six animals and entered into an arrangement with a man to care for the cattle. In 1973, however, they terminated that arrangement and entered into a "cost sharing/profit splitting arrangement" with a neighbor, Mr. Wright, to take over the day-to-day management of the cattle. They operated this venture under the name "R & W Cattle Co." The cattle were kept on petitioner's farm in Deland and on the 46 acres of contiguous land owned by Mr. Wright. *142 On December 31, 1973 through 1979, the R & W Cattle Co. had the following numbers of cattle: [2]Cattle
Bulls
Bulls
Year
Graded
Registered
Common
1973
78
2
0
1974
84
7
1
1975
87
2
1
1976
75
2
1
1977
83
1
1
1978
85
1
1
1979
79
1
3
On June 6, 1980, the R & W Cattle Co. had 128 Angus cattle comprised of 3 bulls, 25 steers, 50 mature cows, and 50 calves. Investment in Simmental Cattle Breeding Program
In 1974, two of petitioner's friends, who were also physicians, informed him of an investment that they had made in a Simmental cattle breeding program marketed by Florida Simmental Farms, Inc. (hereinafter FSF), and Simmental Management Services, Inc. (hereinafter SMS). They told him that they were pleased with their investment and showed him a document entitled "Simple Facts" which had been published by the promoters of the breeding program and presented a projection of the consequences of an investment therein (hereinafter referred to as "the projection"). In addition, petitioner's friends showed him a pamphlet entitled "Florida Simmental Farms Presents Cattle *143 Management Service" published to promote the breeding program and a magazine entitled "The Simmental Story" published by the American Simmental Association (hereinafter ASA). The magazine published by the ASA discussed the different types of Simmental cattle and the background and characteristics of the breed. The Simmental breeding program was also recommended to petitioner by his accountant, John Pollet, [3] who emphasized the tax benefits that he could obtain from such an investment. The principal individuals behind the breeding program marketed by FSF and SMS were Bryan W. Judge and Gene Folck, both of whom had been involved in the cattle industry for many years. Mr. Judge was the president of both FSF and SMS. The projection had been prepared by Mr. Judge to promote the breeding program. It assumed a purchase of five bred one-half blood Simmental cows for $50,000. FSF would finance the entire purchase price and SMS would maintain, manage, and breed the herd for six consecutive years under a fee schedule provided in the projection. The projection *144 set forth the following chart summarizing the consequences of an investment in the breeding program: [4]
PROJECTED CONSEQUENCES OF AN INVESTMENT IN BREEDING PROGRAM MAINTENANCE
TOTAL
MANAGEMENT
& BREEDING
ALLOWABLE
YEAR
[5] DEPRECIATION INTEREST
FEES
FEES
DEDUCTIONS
1974
$9,749
$6,000
$4,000
$19,749
1975
10,062
$4,000
2,000
4,000
20,062
1976
7,547
4,000
2,000
5,000
18,547
1977
7,548
4,000
2,000
8,000
21,548
1978
7,547
4,000
2,000
10,000
23,547
1979
7,547
4,000
2,000
11,500
25,047
TOTAL
ESTIMATED
ESTIMATED
CASH
NO. OF
ESTIMATED
NO. OF
ESTIMATED
YEAR
REQUIRED
COWS
VALUE
BULLS
[6] VALUE 1974
$10,000
5
$12,500
0
1975
10,000
7
20,500
3
$1,500
1976
11,000
10
39,500
2
1,000
1977
14,000
13
68,000
4
2,000
1978
16,000
19
119,500
4
2,000
1979
17,500
25
195,500
7
3,500
*145 The above estimates of the number of cows and their total value for each year were based upon the following value and growth projections: n7Type of Animal Simmental Blood
Value
Bred Cow (Br.)
1/2
$2,500
Open Cow (Op.)
3/4
4,000
Br.
3/4
7,500
Op.
7/8
10,000
Br.
7/8
12,500
Op.
Pure
20,000
ESTIMATED HERD GROWTH Type of Animal
Year
1/2 Br.
3/4 Op.
3/4 Br.
7/8 Op.
7/8 Br.
1974
5
1975
5
2
1976
5
3
2
1977
5
2
5
1
1978
5
3
7
3
1
1979
5
2
10
3
4
Pure
Total
Year
Cow
3/4 Male
7/8 Male
Cows
1974
5
1975
3
7
1976
2
10
1977
3
1
13
1978
2
2
19
1979
1
3
4
25
While the projection indicated that the estimates of herd growth and value were based upon a reproduction rate of 100 percent, it also stated that past experience shows that a reproduction rate of approximately 80 percent can be expected. In addition, it provided that "projections with regard to number of total animals, value, and genetics are subject to several risk factors" and refused to make any guarantees because of "the uncontrollable market and reproduction *146 elements." On the basis of the projected tax benefits and guaranteed bull income, the projection set forth the following cash flow summary: Taxable
Income
1974
1975
1976
1977
$ 52,000
$1,625
$ 296
($1,630)
($2,583)
$ 76,000
3,037
1,578
1,024 ( 1,400)
$100,000
4,024
2,506
417 ( 422)
$140,000
4,969
3,380
1,230 511 Taxable
Income
1978
1979
Total
$ 52,000
($3,997)
($3,997)
($10,286)
$ 76,000
( 2,340)
( 2,340)
( 441)
$100,000
( 1,263)
( 1,263)
3,999 $140,000
( 241)
( 241)
9,608 Finally, the projection stated that the purchaser could elect to pay all management, maintenance, interest and principal costs from the proceeds generated by tax savings and cattle sales. In 1975, petitioner and his wife were introduced to Mr. Judge by their accountant. At that time, they reviewed the projection which had been shown to petitioner by his friends, and Mr. Judge explained the tax consequences of such an investment as set forth in the projection. They never discussed the basis for or the reasonableness of the projected Simmental cattle values relied on in the projection. On December 26, 1975, petitioner, *147 as buyer, and FSF, as seller, executed a document entitled "Sales Agreement" (hereinafter sales agreement) whereby petitioner agreed to purchase five head of bred one-half Simmental blood cows [8] from FSF for $50,000. In conjunction with the execution of the sales agreement, petitioner also entered into a management agreement and an addendum thereto with SMS. Finally, as part of the same transaction, he executed a promissory note, security agreement, and Uniform Commercial Code financing statement. Mr. Judge acted on behalf of both FSF and SMS in consummating this transaction with petitioner. All of the above documents were executed on the same date, December 26, 1975. Prior to the execution of the sales agreement, petitioner had seen the FSF farming operation in Kissimmee during a hunting trip in 1974, but neither he nor his wife had ever seen the cows that he agreed to purchase. Aside from Mr. Judge, petitioners had never spoken to anyone who knew something about the Simmental breed. Under the sales agreement, the purchase price was payable *148 as follows: 4. * * * (a) Principal in the sum of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000), plus interest at the rate of eight percent (8%) per annum from January 1, 1976, through December 31, 1980, paid in the following manner: An amount equal to one hundred percent (100%) of the total net proceeds (gross sales price less commissions, sales costs and expenses and brokerage fees) resulting from the sale of animals in the Herd, with the exception of bull offspring culled from the Herd from time to time, as such animals shall be sold pursuant to the terms of that certain Management Agreement by and between Marker and Simmental Management Services, Inc., of even date herewith, shall be applied to the reduction of principal, until said principal shall be paid in full. Interest accrued on the unpaid principal balance shall be paid quarterly on or before the last day of each quarter (March 31, June 30, September 30 and December 31). Payments of interest shall be deemed to have been made only upon the receipt thereof by Florida Simmental Farms, Inc., its successors and assigns. (b) As evidence of the indebtedness set forth hereinabove, Buyer agrees to execute a Promissory Note *149 of even date herewith, a copy of which is attached hereto as Exhibit "B." Said Note shall provide that commencing on July 1, 1977, Buyer shall have no personal liability of any kind whatsoever thereunder, and that as of the aforesaid date, the holder of the Note upon default shall look only to the collateral (the Herd) and the Buyer shall have no personal liability for any deficiency. [9]
The sales agreement also provided that petitioner would grant FSF a security interest in the herd as "collateral security" for his obligations thereunder, and he agreed to execute and deliver a security agreement to FSF. Pursuant to the promissory note executed by petitioner, he promised to pay FSF the principal sum of $50,000 with interest thereon at a rate of 8 percent per annum commencing on January 1, 1976. The promissory note used language identical to that in paragraph 4(a) of the sales agreement *150 to describe the manner in which the principal and interest due thereunder were payable. With respect to petitioner's personal liability, however, the promissory note stated: Commencing on the third anniversary date of the date hereof, the Maker shall have no personal liability of any kind whatsoever under this Note, and the holder of this Note upon default shall look only to the collateral (as that term is defined in the Security Agreement), to satisfy and discharge the indebtedness represented hereby and the Maker shall have no personal liability for any deficiency. The promissory note also incorporated the terms of the security agreement by reference and provided that it would become immediately due and payable at the option of the holder upon petitioner's default in the performance of any of his obligations under the note itself, the security agreement, or the sales agreement. The sales agreement stated that the five cows purchased by petitioner had been registered with the ASA and that FSF would notify the ASA that the cows had been sold to him. The sales agreement also represented that the cows sold to petitioner had been bred. [10] Under the sales agreement, FSF agreed *151 to replace cows comprising the herd as follows: 3. Seller agrees that in the event that one or more of the cows comprising the Herd dies for any reason whatsoever, commencing on the date hereof through December 31, 1976 at 12:00 P.M., Seller shall replace the deceased cow and its deceased replacement, if applicable, with another cow of approximately the same age, condition and value. Seller shall not be responsible for the replacement of the animals comprising the Hers subsequent to the date and time specified above. All animals substituted for the Basic Herd shall become part of the Basic Herd and carry the same warranties as those cows comprising the original Basic Herd. FSF also agreed to pay $500 for each bull culled from the herd during the term of the management agreement. The sales agreement specifically provided that "there have been no representations or warranties, express or implied, of any nature whatsoever except as expressly set forth herein" and stated that the sales and management agreements represent the entire understanding between the parties. It also recited *152 that the buyer was fully aware of the speculative nature of an investment in breeding cattle. In addition, it indicated that the buyer had reviewed the projection and warned that the various projections set forth therein were subject to certain risk factors, enumerating the following: 7. * * * (a) Management of Herd: Pursuant to the terms of the Management Agreement, Buyer will be relying for the management of the Herd upon the continued existence of Simmental Management Services, Inc. and its ability to manage and maintain the cattle satisfactorily. In the event that Simmental Management Services, Inc. is for some reason unable to perform pursuant to the Management Agreement, the Buyer would be forced to either sell the Herd, which, in the early years of ownership, can be expected to be at a substantial loss, or to find another organization to manage the Herd, at whatever cost and expense this might entail. (b) Sale of Herd: A herd sold or disposed of relatively early after its acquisition cannot normally be expected to be sold for a price comparable to the initial cost. * * * (c) Other Breeds: * * * No assurance can be given, however, that some other existing *153 breed or breeds that may be developed will not have characteristics preferable to the Simmental breed. (d) Prices of Breeding Cattle: The prices of breeding cattle depend on a number of factors, including particularly pedigree, ordinary supply and demand factors, conformation and other physical characteristics a buyer may wish to acquire, and the prices at which these animals may be bought and sold may vary significantly from time to time. In the opinion of the Seller and Simmental Management Services, Inc., the prices of breeding stock, however, do not fluctuate nearly as much as commercial beef prices, and except in the case of material changes in commercial beef prices over an extended period of time, prices of breeding stock would not normally be affected by fluctuations in commercial beef prices. In addition, any substantial increase in the number of animals retained for breeding purposes may over a period of time reduce the price such animals now command in the market. (e) Calving Rate: An important factor in the economic success of operating a herd is its calf crop. In the opinion of Simmental Management Services, Inc., based on prior individual cattle raising *154 experience, properly managed female cattle two (2) years of age or more will calve approximately ninety percent (90%) of their number each year, with approximately fifty percent (50%) male and fifty percent (50%) female. This general ninety percent (90%) calving rate for all breeds nationally is confirmed by recent government reports. The proper management necessary to the attainment of a high calving rate in Simmental cattle includes the careful administration of breeding procedures and the close supervision over heifers during the calving season. However, there is no assurance that the calving rate of the cattle purchased by Buyer will not vary from the foregoing ninety percent (90%) rate and male-female mix. Furthermore, while there is no reliable information available as to the percentage of calves nationally reaching weaning age each year, it is possible that weather conditions or diseases particularly affecting young animals might in some cases reduce a herd owner's annual weaned calf crop to eighty percent (80%) or seventy percent (70%). (f) Accidents and Disease:Cattle are subject to a wide variety of diseases and accidents and Simmental Management Services, Inc. *155 does not plan to provide insurance against such risks.A Buyer will receive limited protection from such risks by reason of the replacement provisions for the Herd as set forth in paragraph 3 of this Agreement. Simmental Management Services, Inc. will carry insurance against death of the cattle comprising the Basic Herd and the female offspring thereof, from fire, lightning, windstorm and like calamities in an amount sufficient to cover replacement costs, which insurance shall be in effect through December 31, 1976 at 12:00 P.M.In the event that Buyer desires to continue such insurance coverage commencing on January 1, 1977, the cost thereof must be borne by Buyer and must be paid in advance to Simmental Management Services, Inc. (g) Culled Animals: It will become necessary from time to time to cull certain of the animals from the Herd. Such animals will include all bulls, infertile progeny, animals whose progeny are not likely to be worth the expense of maintenance, and animals that produce progeny with undersirable traits and characteristics that should be eliminated from the Herd. Culled animals will generally be sold for beef, and their realizable value will, therefore, *156 be less than that of qualify animals. Seller's and Simmental Management Services, Inc. replacement policy does not extend to infertile progeny or other culled animals.
(h) Herd Growth: To the extent that a Herd's progeny consists of a disproportionate number of bulls, the Herd will grow at a slower rate and will generally have less value.* * * While the sales agreement specifically stated that petitioner and SMS were entering into a management agreement which provided for the maintenance, management, and breeding of the five cows and all offspring thereof, it also provided that petitioner could purchase the cows without entering into the management agreement if he paid the full purchase price in cash. In addition, at any time after the execution of the sales agreement, FSF agreed to turn the herd over to petitioner upon written notice from him to SMS and full payment of the purchase price. In the event that petitioner decided to remove the herd from the care and maintenance of SMS, the sales agreement provided that he would release FSF from all obligations under both the sales and management agreements.
Under the management agreement, SMS agreed "to breed, care for, maintain, *157 feed, transport and provide whatever is necessary, including, without limitation, medical services and facilities" to petitioner's herd. In addition, SMS agreed to counsel and advise petitioner with respect to the timely sale of animals, the retention of offspring, the incorporation of offspring in the breeding program, and the culling of bulls and non-breeding heifers from the herd. As stated in paragraph 7(f) of the sales agreement, SMS promised to carry insurance against the death of cattle from fire, lightning, windstorm, and like calamities in an amount sufficient to cover replacement costs through December 31, 1976. The management agreement also provided that SMS would maintain various records with respect to the herd which would be open to inspection and would make annual reports to petitioner on the status of the herd. In exchange for (1) "the maintenance and breeding services" and (2) "the management and counseling services" to be performed by SMS under the management agreement, petitioner promised to pay the following fees: Fees
Period
Maintenance and Breeding
Management and Counseling
Through 12/31/75
$4,000
$6,000
1/1/76 through 12/31/76
4,000
2,000
1/1/77 through 12/31/77
5,000
2,000
1/1/78 through 12/31/78
8,000
2,000
1/1/79 through 12/31/79
10,000
2,000
1/1/80 through 12/31/80
11,500
2,000
*158 To secure his obligations under the management agreement, petitioner agreed to grant SMS a security interest in the herd. With respect to the control and sale of the herd, the management agreement provided as follows: 15. Subject to the express provisions contained herein, and so long as this Agreement is in effect or the Note (as defined in the Sales Agreement) or any part thereof remains unpaid, Simmental Services, its successor and assigns, shall have full and absolute control of the location, maintenance, expansion, breeding and culling of the Herd which constitutes the collateral security for such Note. * * * With the exception of the absolute and unqualified discretion vested solely in Simmental Services to cull animals from the Herd from time to time as Simmental Services deems appropriate, all sales of animals from the date hereof through December 31, 1978, shall be subject to the written approval of Owner. * * * Commencing on January 1, 1980, Simmental Services shall have absolute and unqualified discretion without Owner's written authorization to sell animals from the Herd from time to time as Simmental Services in its sole opinion deems appropriate, unless this Agreement *159 is sooner terminated. Simmental Services hereby acknowledges that unless Owner shall terminate this Agreement by entering into some other management agreement and by paying all fees and expenses due pursuant to this Agreement and the Note, it is the intention of Simmental Services to sell all of the animals comprising the Herd on or before December 31, 1980. The management agreement specified that the net proceeds realized upon the sale of animals from the herd would be distributed in the following manner: (a) Commencing on the date of execution hereof, Florida Simmental Farms, Inc. as Seller under the terms of the Sales Agreement shall receive one hundred percent (100%) of all net proceeds until such time as the principal sum due under the Note shall be paid in full. (b) Commencing on the date that the Purchase Price specified in the Sales Agreement is paid in full to Florida Simmental Farms, Inc., an amount equal to one hundred percent (100%) of the total net proceeds, as defined in the Sales Agreement, shall be paid by Simmental Services to Owner. (c) The net proceeds from the sale of bulls culled from the Herd during the course of the preceding calendar year shall be *160 paid to Owner on or before the first day of February of each year during the term of this Agreement. The management agreement provided that it would terminate when the liquidation sale of the herd had been completed, but gave SMS the option to sooner terminate the agreement by giving 90 days' written notice at any time after the promissory note had been paid in full. In addition, SMS had the option to automatically terminate the management agreement, without notice, upon petitioner's failure to pay amounts due under the promissory note or the management agreement itself. The management agreement also stated that any default by the owner thereunder would constitute a default under the sales agreement, promissory note, and security agreement. It incorporated by reference the provisions of paragraph 7 of the sales agreement, wherein the risks of the subject investment was set forth in detail. Finally, to guarantee that the purchase price payable pursuant to the sales agreement and promissory note would be fully discharged from the proceeds of the sale of the herd, the addendum to the management agreement provided that SMS would purchase two or more of the herd for the values set *161 forth in the projection at the end of the sixth year of the management agreement. Pursuant to the security agreement, petitioner assigned the herd to FSF and SMS in order to secure the performance of his obligations under the sales agreement, promissory note, and management agreement. The security agreement stated that the following events would constitute a default by petitioner: (i) nonpayment when due whether by acceleration or otherwise of the principal of or interest on any indebtedness secured by this agreement, time being of the essence, or failure by Debtor to perform any other obligation under this agreement or under any other agreement between Debtor and Secured Party; (ii) filing by or against Debtor of a petition in bankruptcy or for reorganization under the Bankruptcy Act or for an arrangement under the Bankruptcy Act; (iii) making a general assignment by Debtor for the benefit of creditors; the appointment of a receiver or trustee for Debtor or for any of Debtor's assets; or the institution by or against Debtor of any kind of insolvency proceedings or any proceeding for the dissolution or liquidation of Debtor; (iv) discovery that any warranty, representation or statement *162 made or furnished to Secured Party by or on behalf of Debtor was false in any material respect when made or furnished. The security agreement provided that FSF and SMS could declare all or any part of the indebtedness secured thereby to be due immediately upon petitioner's death or the happening of any event of default.
All of the cows sold to petitioner under the sales agreement were born in either 1970 or 1971 and were registered with the ASA. After the execution of the sales agreement, such cows were thence-forth identified as part of petitioner's herd pursuant to FSF's records, as were the offspring of such cows. The ASA registration of the cows, however, remained solely in the name of FSF. SMS sent annual reports to petitioner which set forth the breeding status of the herd and its calf crop. For 1976 and 1977, the herd had the following calf crops: Calf Crop
Fermale
Male
1976
2
3
1977
3
2
One of the females born to the herd in 1977 died prior to the end of that year. From 1975 through 1978, Mrs. Ramirez wrote checks to FSF and SMS for payments which were characterized as follows pursuant to the sales and management agreements: *163 Maintenance and
Management
Breeding Fees
Fees
Interest
[11] Principal 1975
$4,000
$6,000
1976
4,000
2,000
$4,000
1977
2,750
2,000
4,000
$8,000
1978
6,000
2,000
3,480
7,500
Petitioner and his wife made the principal payments in 1977 and 1978 because their accountant had advised them that it was necessary for tax purposes. For purposes of this proceeding, the parties have agreed to the following schedule of reasonable maintenance and management expenses: Annual
Maintenance and
Age
Management Expenses
Mature Animal
$600
6 to 15 months
400
Birth to 6 months
In June 1979, petitioner took the herd which was then comprised of 11 cattle and placed them on 40 acres of land adjoining his home in Kissimmee, Florida. This action was taken after the Internal Revenue Service had begun auditing his income tax returns for the years in issue and had questioned his investment in the breeding program. No additional payment on the principal balance of the purchase price was made by petitioner when he took the herd, nor had any *164 such payment been made prior to the time of the trial of this case. Petitioner never paid any maintenance or management fees for 1979. Background and Valuation of Simmental Cattle
Simmental cattle comprise the most populous breed of cattle in continental Europe. During the 1960's, the Canadian government established quarantine stations to facilitate the importation of European cattle into North America, and the first Simmental, a bull, was imported into Canada in 1967. Prior to that time, a quarantine for hoof and mouth disease had prevented the importation of cattle from continental Europe into North America. After the importation of Simmental cattle began, the unavailability of adequate numbers of purebred cattle caused both the ASA and the Canadian Simmental Association to initiate programs whereby cows of other breeds were bred to purebred Simmental bulls and the female progency registered as one-half Simmental. Succeeding generations also sired by purebred bulls would be eligible for registration as three-quarter Simmental, seven-eighths Simmental, and purebred. Both associations recognized the seven-eighths female and fifteen-sixteenths male as purebreds. The *165 purpose of the upgrading program was to allow the rapid creation of a large number of purebred Simmental cattle. In addition, the ASA recognized what is known as "open A.I." whereby a Simmental breeder could mate his cows to the best bulls of the herd through artificial insemination. Since the ASA did not require a special breeding certificate or ownership of the sire, this represented a significant advantage to the average breeder and furthered the growth of the Simmental breed in the United States. Generally, the purpose of a registered breeding herd is to improve and propagate registered seedstock that are needed by the commercial beef cattle producer. Although the registered cattle breeding market is dependent upon the beef cattle market, the price movements of the two markets are not parellel. Traditionally, the prices of registered cattle do not change direction as quickly, but rather tend to increase and decrease at a later time than beef cattle prices. The prices of registered cattle are usually unaffected by short-term fluctuations in beef cattle prices. Petitioner was one of six individuals who invested in the breeding program marketed by FSF and SMS. A total of *166 28 one-half Simmental blood cows were sold to such individuals pursuant to the breeding program. FSF acquired most of those one-half Simmental blood cows, including the cows sold to petitioner, for prices ranging from $700 to $2,000 at auctions held throughout the United States and Canada. The cows sold to petitioner were purchased between 1971 and 1973 in states other than Florida for prices ranging from $1,000 to $2,000. Although the market for Simmental cattle in Florida was limited, FSF had bought and sold Simmental cattle in Florida for prices approximating those it had paid for Simmental cattle purchased at auctions held in other states. As the lowest level of the ASA upgrading program, one-half Simmental blood cows had certain limitations that affected their values.First, since half bloods could not produce a purebred, they did not have the ability to produce an animal of extraordinary value. Second, as more animals of a higher or purebred level became available, the value of half bloods would automatically decrease. Finally, since a breeder could use any cow as a base and was allowed to use open A.I., the range of qualitative differences among half blood cows was limited. *167 While there would undoubtedly be some difference between the qualities of individual animals, it would be nothing like the variations in pedigree and value that were possible at the purebred level. In 1973, the commercial beef cattle market took a drastic dip which was not reflected in the registered Simmental cattle market until the fall of 1974. In June 1974, a bred one-half Simmental cow had a fair market value in the range of $1,500 to $2,500. By early 1975, however, the prices of registered Simmental cattle had dropped sharply, and as of December 26, 1975, a good one-half Simmental blood cow that had been bred had a fair market value in the range of $450 to $800. The Simmental cattle values relied on in the projection reflected the top selling prices of the specified types of Simmental cattle in early 1974 when the projection was prepared. Such values were clearly inaccurate on December 26, 1975. Moreover, those values never constituted a realistic projection of the values that the specified types of Simmental cattle would have upon the expiration of the management agreement. First, the 1974 prices reflected both a relative scarcity of purebred and high percentage Simmental *168 cattle at that point in time and the fact that the Simmental breed was a glamorous new breed in North America.Second, no consideration was given to the ASA upgrading program which was designed to quickly increase the population of purebred Simmental cattle in the United States. It was anticipated that by the early 1980's the Simmental would be a purebred breed in the United States rather than an upgrading breed and would have a price structure paralleling that of the other purebred breeds where only the extraordinary breeding animal can command a price in excess of $10,000. By June 1980, Simmental cattle had arrived as a purebred breed in the United States. At that time, the demand for one-half Simmental blood cows was negligible with such cows selling at premium of $100 to $150 over their commercial value. While an extraordinary purebred Simmental cow could sell for a price in excess of $10,000, many purebred cows with calves at side were selling for prices of $1,100. Tax Returns and Notice of Deficiency
On their 1975, 1976, and 1977 tax returns, petitioner and his wife reported income of $121,839, $91,158, and $94,782, respectively. For those years, petitioner claimed *169 the following deductions attributable to the Simmental cattle breeding program: Deduction
1975
1976
1977
Management and
Maintenance Fees
$10,000
$ 6,000
$ 4,750
Interest
4,000
4,000
Depreciation
10,571
11,264
8,046
Total Loss Claimed
$20,571
$21,264
$16,796
In addition, petitioner claimed an investment credit for 1975 of $5,000 for the purchase of the Simmental cattle. [12]
*170 In the notice of deficiency, respondent disallowed the investment credit and the deductions claimed by petitioner in connection with the breeding program. OPINION We must decide whether petitioner is entitled to the deductions claimed in connection with his investment in the Simmental cattle breeding program.
Respondent contends that petitioner is not entitled to any of the claimed deductions because the investment in the breeding program lacked economic substance and was entered into solely for tax purposes without any profit motive within the meaning of section 162[13] or section 212.[14] Relying on Estate of Franklin v. Commissioner,544 F. 2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), respondent also argues that petitioner is not entitled to the claimed deductions because he never acquired an investment in the cattle or incurred a genuine indebtedness to purchase the cattle.
Petitioner, on the other hand, maintains that his investment *171 in the breeding program was motivated by the significant potential for economic gain set forth in the projections shown to him. Furthermore, petitioner asserts that Estate of Franklin v. Commissioner,supra, is distinguishable and that the rationale relied on therein is inapplicable to the instant case. Accordingly, petitioner insists that he is entitled to the deductions claimed in connection with his investment in the cattle breeding program. For the reasons set forth below, we disagree with petitioner and hold for respondent. We do not believe that FSF ever made an actual sale of the one-half Simmental blood cows to petitioner pursuant to the transaction herein under consideration. On the record before us, we must conclude that the breeding program was without economic substance and that petitioner entered the program solely to acquire tax benefits.Petitioner purchased nothing more than a package of tax consequences. The purported sale of the cattle to petitioner and the labels attached to the payments made to FSF and SMS constituted a sham engaged in to create artificial tax benefits and must be disregarded for tax purposes. It is well established that *172 the economic substance of a transaction, rather than its form, controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Derr v. Commissioner,77 T.C. 708 (1981). Although a taxpayer is entitled to reduce his taxes by any means that the law allows, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering,293 U.S. 465, 469 (1935). The labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on other grounds 544 F. 2d 1045 (9th Cir. 1976). In Frank Lyon Co. v. United States,supra at 572-573, the United States Supreme Court provided a summary of these principles which we find particularly relevant: This Court, almost *173 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed -- the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 378, 50 S. Ct. 336, 74 L. Ed 916 (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., Commissioner of Internal Revenue v. Sunnen,333 U.S. 591, 68 S. Ct. 715, 92 L. Ed. 898 (1948); Helvering v. Clifford,309 U.S. 331, 60 S. Ct. 554, 84 L. Ed. 788 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner of Internal Revenue v. Tower,327 U.S. 280, 291, 66 S. Ct. 532, 538, 90 L. Ed. 670 (1946), *174 as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S. at 255, 60 S. Ct. at 210. See also Commissioner of Internal Revenue v. P.G. Lake, Inc.,356 U.S. 260, 266-267, 78 S. Ct. 691, 2 L. Ed. 2d 743 (1958); Commissioner of Internal Revenue v. Court Holding Co.,324 U.S. 331, 334, 65 S. Ct. 707, 89 L. Ed. 981 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner of Internal Revenue v. Duberstein,363 U.S. 278, 286, 80 S. Ct. 1190, 4 L. Ed.2d 1218 (1960). In order to determine the substance of the transaction before us, all of the documents executed by petitioner in entering the transaction must be considered together. The record reveals that both FSF and SMS were under the direction and control of Mr. Judge and that the agreements between petitioner and both entities were entered into contemporaneously pursuant to a preconceived *175 plan. The documents themselves demonstrate their interdependence. After carefully reviewing these documents and the attendant circumstances, we are convinced that FSF did not sell the cattle to petitioner.
Generally, a sale is a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under state law. Houchins v. Commissioner, 79 T.C.     (filed Sept. 29, 1982); Grodt and McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981); Derr v. Commissioner,supra at 723. The question of whether the benefits and burdens of ownership have been transferred is essentially one of fact to be ascertained from the intention of the parties at the time of the sale as evidenced by the written agreements read in light of the attendant facts and circumstances. Houchins v. Commissioner, *176 supra; Grodt and McKay Realty, Inc. v. Commissioner,supra.Among the factors to be considered in making this determination are: (1) whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See Houchins v. Commissioner,supra, slip op. at 27; Grodt and McKayRealty, Inc. v. Commissioner,supra at 1237-1238. [15] Upon considering these criteria and others, we find that the benefits and burdens of ownership of the five Simmental cows were not transferred to petitioner. To the extent that petitioner ever acquired legal title to the five cows, such title was meaningless. Although petitioner received a bill of sale from FSF, he simultaneously assigned the herd (the five cows *177 and their offspring) to FSF and SMS pursuant to the terms of the security agreement. Furthermore, the record establishes that FSF continued to represent itself as the record owner of the herd. The sales agreement specified that FSF would notify the ASA that the five cows had been sold to petitioner. Nevertheless, FSF never notified the ASA and the registration of the cows remained solely in the name of FSF. Mr. Judge testified that the registration was not changed to facilitate FSF's sale of the cattle. Thus, regardless of the fact that the cattle comprising petitioner's herd were identified as such on FSF's records, FSF did represent itself as the owner of the herd to third persons and we have little reason to doubt that petitioner recognized this fact. Moreover, petitioner has failed to prove that he ever acquired an equity in the cattle, either at the time of the alleged sale or subsequent thereto.Petitioner agreed to pay a price of $10,000 for each of the five cows even though the projection itself indicated that they were only worth $2,500 each. [16] Furthermore, through his commercial cattle venture, that is, the R & M Cattle Co., petitioner should have known about the severely *178 depressed state of the market and, correspondingly, should have at least suspected that a value of even $2,500 per cow was too high. Accordingly, we believe that petitioner knew that he was agreeing to pay a purchase price far in excess of the value of the cows. Due to the excessive purchase price and our determination that petitioner did not incur a bona fide recourse liability with respect thereto, we find that petitioner acquired no equity in the cows at the time he executed the sales agreement. In attempting to explain the purchase price that he agreed to pay under the sales agreement, petitioner argues that he was buying more than the five cows. Rather, he contends that he was purchasing a "package" that included not only the five cows, but also included the selection and transportation to Florida of high quality cattle of an exotic breed, a fertility guarantee, a guarantee to replace cattle that died, a market for bull calves, the availability of maintenance and management services, and favorable financing. *179 According to petitioner, this package was worth $10,000 per cow. Upon careful consideration of all the evidence presented herein, we find that the five cows purportedly purchased by petitioner did not have a fair market value in excess of $800 each. [17] Petitioner's attempts to explain a purchase price of $10,000 each for those cows was wholly unsatisfactory. Petitioner's expert was particularly unconvincing. He testified that a price of $10,000 for each of the five cows and the guarantees provided by FSF was reasonable without any real explanation for this conclusion. Petitioner's expert made no attempt to value the individual components of the purported package to which petitioner has ascribed such importance, but simply referred to some of the same components cited by petitioner in attempting to justify his valuation.He also failed to consider the sharp decline in Simmental cattle prices that occured in late 1974 and assessed the value of petitioner's cows on the basis of prices he had paid for such animals prior to that decline. In addition, his credibility became suspect when his own records revealed that he had overstated the average price he paid for one-half Simmental *180 blood cows during 1974. In short, we cannot accord any weight to the testimony of petitioner's expert. On the other hand, we found respondent's expert, Colville C. Jackson, Jr., a forthright and knowledgeable witness. He testified that a "safe valuation" of bred one-half Simmental blood cows would be in the range of $450 to $800 at the time of the sale, a valuation that is supported by evidence in the record with respect to the selling prices of such cattle. In view of petitioner's failure to introduce convincing support for his position, we believe that a valuation of $800 per cow is amply supported by the record.None of the arguments advanced by petitioner support a fair market value in excess of $800 per cow. Initially, we must point out that the quality and breed of the cattle allegedly sold *181 to petitioner are factors that must be considered in any valuation of the animals and cannot be set aside and evaluated as separate components of some package. We are valuing one-half Simmental blood cows and the exotic nature of the Simmental breed and the demand therefor will be reflected in the value of the cows; no further consideration need be given to whether or not the Simmental breed may be characterized as exotic or rare. To the extent that petitioner allegedly purchased something more than the cows, we must value those elements of the transaction. The breed and quality of the cows, however, are not separable elements of the purported sale, and it is impossible to account for the price that petitioner agreed to pay on the basis of the quality of the animals themselves. Regardless of the quality of the cows allegedly sold to petitioner, there were limitations upon the value of one-half Simmental blood cows. Since a breeder could use any cow as a base and was allowed to use open A.I., the range of qualitative differences among one-half Simmental blood cows was limited. In addition, one-half Simmental blood cows lacked the potential to produce an animal of extraordinary *182 value because they could not produce a pure blood animal. Moreover, the value of one-half Simmental blood cows was certain to decline as a result of the ASA upgrading program. Furthermore, we are unable to find that the costs that FSF incurred in selecting and transporting the cows to Florida should be reflected in a higher valuation. Generally, such costs are a component of fair market value. See Lemmen v. Commissioner,77 T.C. 1326, 1351 (1981). While there was not an extensive market for Simmental cattle in Florida, the record shows that FSF bought and sold Simmental cattle in Florida for prices in the same range as those it paid for the Simmental cattle it purchased in other states. Moreover, as with all the other additional costs that petitioner has attempted to inject into our determination of the fair market value of the cows, petitioner failed to even suggest what portion of the purchase price was allocable to the cost of selecting and transporting the cows to Florida. The record also reveals that there is little substance to the guarantees upon which petitioner has relied to support his valuation of the "package." Petitioner has asserted that FSF guaranteed *183 the fertility of the five cows and that such guaranty was more extensive than that normally provided in the industry. To the contrary, the sales agreement simply represented that each of the cows allegedly sold to petitioner had been bred. Since the record indicates that a warranty to replace a non-breeder is a common practice in the industry, such a representation adds nothing to the established fair market value of the cows. See Houchins v. Commissioner,supra, slip op. at 31; Grodt and McKay Realty, Inc. v. Commissioner,supra at 1239. Although the record indicates that FSF did replace an infertile cow, it does not appear that FSF's obligation to replace a non-breeder was more extensive than that common to the industry. In addition, petitioner maintains that FSF did not simply guarantee the cows' fertility, but also guaranteed that each cow would give birth to a live calf. We must reject this contention because it is clearly contrary to the terms of the sales agreement. Thereunder, FSF did agree to replace any of the cows comprising the herd that died before midnight December 31, 1976, but the sales agreement does not contain any guarantee that the *184 cows purchased by petitioner would give birth to a live calf and, in fact, specified that "there have been no representations or warranties, express or implied, of any nature whatsoever except as expressly set forth herein." [18]
Furthermore, the replacement guarantee itself represents insurance against the risk of death, an item which we believe is more appropriately characterized as a cost of managing or maintaining the cattle. See Houchins v. Commissioner,supra, slip op. at 32; Grodt and McKay Realty, Inc. v. Commissioner,supra at 1239. Accordingly, we cannot find that the cost of this guarantee should be considered a component of the cost of the cattle.[19] Similarly, we have a difficult time understanding why FSF's agreement to purchase bull calves for $500 each should be considered a part of the cost of the cattle since the sale of bull calves is obviously *185 associated with the ongoing management of the herd. In this context, it is important to note that petitioner agreed to release FSF from all of its obligations under both the sales and management agreements in the event that he removed the herd from the care and maintenance of SMS. Even if we believed that such an item should be considered in valuing what petitioner purchased pursuant to the sales agreement, we could not include its cost in our estimate of fair market value in the instant case. First, petitioner did not attempt to establish the value of this item. Second, it does not appear that FSF ever made any payments to petitioner for the bull calves born to the herd. Last, and most importantly, we are convinced that the bull calf payments were intended to reduce the excessive fees payable under the management agreement, while at the same time appearing to give petitioner the benefits of ownership. Under the management agreement, petitioner *186 promised to pay the following fees: FEES
Maintenance and
Management and
Year
Breeding
Counseling
Total
1975
$4,000
$6,000
$10,000
1976
4,000
2,000
6,000
1977
5,000
2,000
7,000
1978
8,000
2,000
10,000
1979
10,000
2,000
12,000
1980
11,500
2,000
13,500
$58,500
The parties, however, have agreed to a schedule of maintenance and management expenses that clearly show that such fees were excessive. On the basis of the expense schedule agreed to by the parties, the following represents an approximation of reasonable maintenance and management expenses for the herd over the six years of the Simmental cattle breeding program assuming either an 80 percent or a 100 percent reproduction rate: [20]
*187 Reproduction Rate
Year
80 Percent
100 Percent
1975
$ 50
$ 50
1976
3,200
3,200
1977
4,200
4,300
1978
5,500
6,000
1979
7,300
8,100
1980
9,700
11,400
$29,950
$33,050
Consequently, petitioner agreed to pay maintenance and management fees far in excess of an amount that would have been reasonable. Additionally, the projection incorporated the bull calf payments as an integral element of the cash flow summary set forth therein. The bull calf payments of $500 each, however, represent an arbitrary figure that does not bear any relationship to the value of the bull calves themselves. Under these circumstances, we find ourselves compelled to conclude that the bull calf payments were intended to reduce the excessive maintenance and management fees. We must also reject petitioner's attempt to allocate a portion of the purchase price to the availability of maintenance and management services. To the extent that this represents an attempt to characterize a portion of the purchase price as an additional charge for the subsequent maintenance and management of the cattle, we need only state that the fees payable under the management agreement *188 were considerably more than adequate.On the other hand, if this represents an attempt to argue that a portion of the stated purchase price constitutes a premium paid for the breeding program, the argument is poorly stated and is unsupported by the record. We find an argument that would allocate as much as $46,000 of the purchase price to a premium unpersuasive. Finally, petitioner has failed to establish that any portion of the purchase price is attributable to the alleged financing provided by FSF. Although petitioner never argued that a portion of the purchase represents unstated interest, he baldly asserted in a very ill-defined manner that some part of the purchase price constitutes an additional charge for the financing. We are not bound to accord any weight to such an argument. Moreover, even if we believed that the purchase price included some sort of charge for the financing, the amount of the purchase price attributable thereto could hardly account for the $46,000 that petitioner agreed to pay above the fair market value of the five cows. Not only has petitioner failed to prove that he acquired an equity in the cows at the time he executed the sales contract, but *189 he also failed to establish that he acquired an equity at any time thereafter. At the time petitioner executed the sales agreement, the prices of registered Simmental cattle had already dropped acutely, reflecting the earlier decline in the commercial cattle market. Therefore, the values set forth in the projection were clearly outdated because they reflected the prices of Simmental cattle in early 1974 when the projection was prepared. Even at the time the projection was prepared, the value and growth estimates set forth therein were unrealistic. The herd growth estimates were based on a reproduction rate of 100 percent, even though the projection itself admitted that a reproduction rate of 80 percent could be expected. Moreover, it was inappropriate to use the 1974 prices of Simmental cattle to project their value six years hence because such prices reflected both a scarcity of purebred and high percentage Simmental cattle and the novelty of the recently introduced breed, a situation that would be quickly remedied by the ASA upgrading program. The 1974 prices could be expected to decline steadily as the Simmental breed approached purebred status in North America, an objective *190 that was realized by 1980. [21]
Furthermore, the record does not show that the value of petitioner's herd ever exceeded the principal amount of the note. If anything, the record indicates something quite to the contrary. After the Internal Revenue Service had begun auditing petitioner's tax returns for the years in issue, he was allowed to take the herd without making any further payments on the principal balance of the note. The sales agreement, however, required petitioner to pay the entire purchase price before he could take possession of the herd. We believe that it is unlikely that FSF would have allowed petitioner to take possession of the herd without further payment if it had a value anywhere near the $34,500 remaining principal balance on the note. The unreasonable discrepancy between the stated purchase price and the fair market value of the property presented in the instant case constitutes a critical factor in our determination that the *191 transaction herein does not constitute a sale.A normal attribute of a true arm's-length sale is a purchase price at least approximately equal to the fair market value of the property. Houchins v. Commissioner,supra, slip op. at 37; Estate of Franklin v. Commissioner,544 F. 2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1976); Grodt and McKay Realty, Inc. v. Commissioner,supra. See also Narver v. Commissioner,75 T.C. 53 (1980), affd. 670 F. 2d 855 (9th Cir. 1982); Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F. 2d 316 (9th Cir. 1982). In Estate of Franklin, a partnership purportedly purchased a motel for $1,224,000 and leased it back to the sellers. At the time of the sale, the partnership made a payment of $75,000 in prepaid interest, but none of the purchase price was paid at such time. The purchase price was to be paid in monthly installments over a ten-year period with a large balloon payment due at the end of such period. Pursuant to the sale-leaseback, the monthly principal and interest payments that the partnership agreed to make were *192 approximately equal to the seller's rental payments. The partnership's obligation to pay the purchase price was nonrecourse; it was only secured by the motel. The Ninth Circuit had to determine whether the members of the partnership were entitled to deduct interest payments and depreciation with respect to the motel. The court held that the partners were not entitled to the deductions. In reaching its decision, the Ninth Circuit found that the taxpayers had failed to show that the purchase price of the motel -- the principal amount of the nonrecourse indebtedness -- was at least approximately equal to its fair market value. The court determined that this defect in the taxpayers' proof was fatal to their case, stating as follows: An acquisition such as that of [taxpayers] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale. No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair *193 market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. * * * [544 F. 2d at 1048.] In the view of the court, an excessive purchase price and the resultant failure to acquire an equity in the property caused the transaction to lack the substance of a sale. Under these circumstances, the partnership did not make any investment in the property, the prerequisite to a depreciation deduction under section 167. In addition, the court found that the partnership did not incur a genuine indebtedness, as required for an interest expense deduction under section 163, because a purchaser does not acquire the use or forbearance of money when a nonrecourse indebtedness unreasonably exceeds the value of the security therefor. In such a situation, the buyer has no economic incentive to actually pay the purchase price. An examination of the objective facts shows that petitioner's *194 investment in the breeding program was not designed to quickly yield an equity which he could not prudently abandon. Nevertheless, petitioner argues that the reasoning in Estate of Franklin is inapplicable to the instant case because he was personally liable for the purchase price. We cannot agree.
On the basis of the record herein, we cannot for tax purposes accord any respect to the recourse liability set forth in the sales agreement and the promissory note. The documents themselves show that the parties thereto were not concerned with petitioner's liability for the purchase price. Although the sales agreement and the promissory note were executed at the same time, they are inconsistent with respect to the term of petitioner's recourse liability. The sales agreement provided that petitioner would be personally liable for the purchase price, until July 1, 1977, a period of approximately one and one-half years, while the promissory note stated that his personal liability would expire on the "third anniversary" of the date of its execution. We doubt that either petitioner or Mr. Judge would have overlooked this inconsistency if they entered the transaction intending to subject *195 petitioner to a bona fide recourse liability which would be enforced under the appropriate circumstances. Such a conclusion is inescapable in light of the fact that petitioner must have known that the stated purchase price was tremendously excessive. In addition, Mr. Judge's testimony exhibited considerable confusion with respect to the nature of petitioner's liability for the purchase price. Under these circumstances, we cannot find that petitioner acquired an equity in the cows due to purported recourse liability that in any event would expire prior to the time full payment of the purchase price was due. [22] Interestinly enough, not only was petitioner's recourse liability scheduled to expire prior to the conclusion of the breeding program, but pursuant to the terms of both the sales agreement and the promissory note the purchase price was payable solely out of the net proceeds realized from the sale of the cattle. [23] In sum, we think that the purported recourse liability was simply part of the facade constructed to give the transaction the appearance of a sale. Accordingly, we do not believe that petitioner ever made an actual investment in the cattle or incurred a genuine *196 indebtedness to purchase the cattle. [24]
*197 In addition, petitioner did not acquire any right to possess or exercise any real control over the herd. Under the management agreement, SMS had "full and absolute control of the location, maintenance, expansion, breeding and culling of the [h]erd." The only right that SMS did not possess is the right to sell the animals comprising the herd, other than culls. Although petitioner could have taken possession of the herd and terminated the management agreement upon full payment of the purchase price, such a right does not indicate that there was a sale when, at the inception of this transaction, the purchase price was far in excess of the value of the cattle. [25] See Houchins v. Commissioner,supra, slip op. at 41; Grodt and McKay Realty, Inc. v. Commissioner,supra at 1241-1242. *198 Moreover, since petitioner had no investment in the cattle, he did not directly bear the risk of loss with respect to the cattle. Indeed, we think that in reality FSF retained both the risk of loss with respect to petitioner's herd and the benefits, if any, to be realized upon its disposition. Upon the disposition of the herd, FSF was entitled to retain the proceeds needed to satisfy the principal balance due on the note, and at the time of the purported sale there was little, if any, chance that the value of the herd would ever equal the purchase price. Accordingly, FSF bore the risk that the herd would decrease in value and stood to benefit from any increase in value up to the principal balance of the note. Petitioner's only opportunity to profit from the sale of the herd was in the highly improbable event that the herd sold for a price in excess of $50,000. We do not consider this sufficient to support a finding that petitioner acquired the benefits of ownership. See Houchins v. Commissioner,supra, slip op. at 42; Grodt and McKay Realty, Inc. v. Commissioner,supra at 1242-1243. On the basis of the foregoing, we must conclude that petitioner's *199 investment in the breeding program did not constitute a sale. We believe that the transaction was structured as a sale solely to lay the foundation for the package of tax benefits that petitioner acquired by means of his investment in the breeding program. On many prior occasions, the courts have disregarded for tax purposes transactions that are devoid of economic substance and are engaged solely to acquire tax benefits. See, e.g., Knetsch v. United States,364 U.S. 361 (1960); Grodt and McKay Realty, Inc. v. Commissioner,supra;Derr v. Commissioner,supra.The facade constructed by the promoters of the breeding program to support the tax consequences set forth in the projection is without economic reality and must be disregarded as a sham. At the time petitioner entered the breeding program he acquired nothing of any conceivable value aside from the tax benefits. While the unrealistic projected Simmental cattle values that were used to promote the breeding program raise serious questions concerning the program's economic substance even in 1974, by the time petitioner entered the program any such substance was nonexistent. *200 The prices of Simmental cattle had declined sharply from their 1974 levels, the levels upon which the projected herd values were based. Yet, petitioner agreed to purchase five cows that were worth no more than $4,000 for a price of $50,000. There was no realistic possibility that the value of the herd would ever exceed the purchase price. Due to the ASA upgrading program, Simmental cattle would soon be a purebred breed and would have a price structure paralleling that of the other purebred breeds where only an extraordinary animal can command a price in excess of $10,000. We consider the possible production of such a rare animal too remote to lend any economic substance to the transaction, especially since we do not believe that petitioner ever relied on such a possibility. [26]
In Houchins,supra, involving the same program as involved in the instant case, we concluded that since the taxpayer therein attached some value to the right he acquired to purchase the herd, we were unwilling to characterize the entire transaction as a sham which must be wholly disregarded for tax purposes. In the instant *201 case, however, we think that petitioner entered the breeding program solely to reduce his taxes. Although petitioner had no prior experience with registered cattle, his investment in commercial cattle must have alerted him to the severe and prolonged decline in the price of commercial cattle that occurred in 1973.In addition, the sales agreement itself warned that material changes in commercial beef prices could affect the registered cattle market and it was obvious that the projection given to petitioner had been prepared in 1974 or earlier. Nevertheless, he never questioned the projected Simmental cattle values relied on in the projection and entered the program without even examining the cows he was agreeing to purchase. The projection indicated that in the early years of the breeding program petitioner could expect to receive substantial tax benefits from an investment in the program. Indeed, it indicated that petitioner could expect a positive cash flow even if he made all of the required payments during the full six years of the program. [27] At the very end of 1975, petitioner entered the breeding program and acquired tax deductions and credits to offset his substantial *202 income for that year. Although he ostensibly paid $10,000 for the maintenance and management of five cows for six days during 1975, he had to know that he was not paying such a sum for maintenance and management services. Moreover, we have found that he knew that he had agreed to pay a purchase price that far exceeded the value of the five cows; a purchase price that would never be paid and was used to inflate his basis in the cattle for depreciation purposes. Aside from the unsupported testimony of petitioner and his wife, the record does not show that he ever exhibited any concern for the economic success or failure of the breeding program. His only concern was with the tax consequences he expected to flow therefrom. At the very end of 1977 and 1978, petitioner made payments on the principal balance of the promissory note because his accountant had advised him that it was necessary for tax purposes. Apparently, his accountant was concerned *203 with the recently enacted at-risk limitations under section 465 and the expiration of petitioner's recourse liability under the sales agreement on July 1, 1977. It also appears that petitioner took possession of the herd in 1979 merely hoping to forestall the Internal Revenue Service audit that had questioned the tax benefits he claimed with respect to his investment in the breeding program. [28]
In conclusion, we hold that petitioner's payments to FSF and SMS were made to purchase tax benefits and nothing more. Therefore, we are not bound to respect the labels that the parties attached to the payments made by petitioner. Since the transaction cannot be recognized for tax purposes, respondent's determination must be sustained. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. The record does not describe the other 20 acres of land owned by petitioner and his wife in Deland, Florida.↩
2. This category includes cows, calves, and some steers.↩
3. Mr. Pollet was also the accountant for the two physicians that had originally informed petitioner of the breeding program.↩
4. The projection had been prepared under the assumption that the initial investment in the breeding program would be in 1974 and, therefore, that the six-year term of the program would run from 1974 through 1979.↩
5. The projection also stated that the purchaser would be entitled to an investment tax credit of $2,330. ↩
6. FSF guaranteed to purchase all male offspring for $500 each.↩
8. Each cow was pregnant with a three-quarter blood Simmental calf as a result of being bred with a full-blood Simmental bull.↩
9. The sales and management agreements referred to the five cows purchased by petitioner as the "Basic Herd," while referring to the five cows and all offspring thereof as the "Herd." In discussing the terms of these sales, management, and security agreements, we shall use the same terminology.↩
10. A guarantee to replace a non-breeder is a common practice in the registered cattle industry.↩
11. The principal payments were made at the very end of each of the respective years.↩
12. On the other hand, the projection had stated that petitioner would only be entitled to an investment credit of $2,330. There are two reasons for this discrepancy. First, in 1974 the investment credit was equal to seven percent of the qualified investment, and the projection had assumed an investment in the breeding program in 1974. For property acquired after January 21, 1975, however, the investment credit was equal to 10 percent of the qualified investment. See sec. 301(a), Tax Reduction Act of 1975, Pub. L. 94-12, 89 Stat. 36. Second, petitioner determined his qualified investment employing a useful life of seven years or more, while it appears that the projection had been prepared under the assumption that the cattle had a useful life of only five to seven years for purposes of computing the qualified investment. See sec. 46(c)(1) and (2).↩
13. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. ↩
14. Respondent has not argued that sec. 183 is applicable to the instant case.↩
15. See also Hunter v. Commissioner,T.C. Memo. 1982-126↩.
16. In addition, the sales and management agreements both stated that the sale of the herd in the "early years of ownership" would probably be at a "substantial loss."↩
17. We note that in Houchins v. Commissioner,↩ 79 T.C.     (filed Sept. 29, 1982) we found, as for the year 1974, that a valuation of $2,500 per cow to be fair and even generous. Here we are dealing with later years, and as previously noted, by December 26, 1975, a good one-half Simmental blood cow that had been bred had a fair market value in the range of $450 to $800.
18. Although the sales agreement defines the term herd to include offspring, we cannot, as petitioner does, read the term offspring to include an unborn calf. Certainly, if FSF had intended to guarantee a live calf, the sales agreement would have so stated in a more plausible fashion.↩
19. Even if we considered the replacement guarantee a part of the cost of the cattle, the record indicates that insurance against the risk of death would have only cost approximately $41 per cow for the term of the replacement guarantee.↩
20. We have adopted this approximation of reasonable maintenance and management expenses from a computation made by respondent on brief. These figures have been prepared under the assumption that each heifer calf crop is born on April 1. Therefore, in the year each heifer calf is born there will be no maintenance and management expenses incurred during the first nine months of the year (the three months before the calf is born and six months after birth). For the remaining three months of the year, the maintenance and management expenses would equal $100 ($400 X one-fourth of a year). In the second year, each heifer born to the herd is assumed to be under 15 months of age for six months during which maintenance and management expenses would equal $200 ($400 X one-half of a year), while maintenance and management expenses for the remainder of the year would be $300 ($600 X one-half of a year), for a total of $500.↩
21. In addition, we note that the projected value of the original five cows did not reflect any decline in their value over the six-year term of the breeding program. Obviously the cows would decline in value as they aged.↩
22. Even if we believed that petitioner did incur some recourse liability under the agreements he executed, we would not find that he was ever personally liable for payment of the purchase price. Rather, we would conclude that the recourse liability was used to insure that the promoters of the breeding program would receive a minimum payment through the amounts that petitioner agreed to pay as maintenance and management fees and interest. Pursuant to the agreements petitioner executed, his failure to pay either the interest or the maintenance and management fees would constitute a default under the sales agreement and promissory note. Certainly, it was not reasonable from an economic point of view for petitioner to pay the purchase price at the time he executed the sales agreement, but by paying the amounts denominated as interest and maintenance and management fees for the term of his recourse liability he would avoid ever having to pay the purchase price and obtain substantial tax benefits (at least, that is what he was led to believe). ↩
23. To guarantee that the purchase price would be fully discharged from the proceeds of the sale of the herd, the addendum to the management agreement provided that SMS would purchase two or more of the herd for prices equal to the unrealistically high values set forth in the projection. In our opinion, this provision indicates that the parties did not contemplate that the purchase price would ever actually be paid. ↩
24. We do not believe that petitioner simply made a bad bargain. See Estate of Franklin v. Commissioner,544 F. 2d 1045, 1049↩ (9th Cir. 1976). Since the projection and both the sales and management agreements clearly indicate that the five cows were worth substantially less than the purchase price, petitioner must have known that the stated purchase price was excessive. In addition, petitioner's experience with commercial cattle should have caused him to at least suspect that the cows were worth considerably less than the sales agreement and the projection indicated. Accordingly, we are thoroughly convinced that petitioner embarked upon this transaction with his eyes wide open.
25. We cannot accord any weight to the fact that petitioner took actual possession of the herd in 1979.He did so only after the Internal Revenue Service had begun auditing his tax returns for the years in issue and had questioned the deductions and credits he claimed with respect to the breeding program. When he took the herd, petitioner did not pay FSF the remaining balance on the note as required under the sales agreement, and indeed, we do not believe that he ever intended to make any further payments on the note. It is unlikely that Mr. Judge would simply give petitioner the herd, especially considering that on January 1, 1980, shortly after petitioner took the herd, SMS had absolute authority to sell the cattle unless petitioner paid the full purchase price. In view of the series of manipulations engaged in to create the tax benefits herein at issue, we believe that Mr. Judge allowed petitioner to take the herd hoping to quell the objections of the Internal Revenue Service.↩
26. See Hunter v. Commissioner,T.C. Memo. 1982-126↩.
27. In fact, petitioner did not make all of the required payments. He did not pay the full amount of the maintenance and breeding fees during 1977 or 1978, and it does not appear that he made any payments whatsoever in 1979 or 1980.↩
28. See note 24 supra.↩